**AMERICAN ELASTICS, Inc., v. UNITED STATES.**

No. 83, Docket 21799.

United States Court of Appeals Second Circuit.

Argued Dec. 7, 1950.

.Decided Feb. 20, 1951.

Gordon, Brady, Caffrey & Keller, New York City, for appellant; Leo Brady, Leroy C. Curtis, New York City, of counsel.

Irving H. Saypol, U. S. Atty., New York City, for appellee; Harold J. Raby, Asst. U. S. Atty., New York City, of counsel.

Before L. HAND, Chief Judge, and SWAN and CHASE, Circuit Judges.

CHASE, Circuit Judge.

The plaintiff, a New York corporation doing business in New York City, sued the United States to recover the price it had paid for some war surplus webbing material purchased from the defendant under a written contract, dated December 5, 1944, which will be called the Chicago contract. It sought to have this contract rescinded because of a mutual mistake of the parties in believing that the material was as represented when in fact it was not, or for breach of warranty in the sale of goods by sample and by description. The defendant answered by denying that the material was not as represented, by denying any mutual mistake as to its condition or breach of warranty, and by filing a counterclaim in which it sought to recover the unpaid purchase price of additional elastic webbing which it had sold to the plaintiff under another written contract, dated May 7, 1945, which will be called the Troy contract. The plaintiff replied to this counterclaim by denying that any of the purchase price was due and further by alleging that the material which it had purchased under the Troy contract was not as represented. It sought to recover what it had already paid for material delivered under that contract.

The government asserted that all the material it sold under both contracts was purchased by the plaintiff upon an "as is" basis, and the court, sitting without a jury, so found, although it also found that the material delivered under the Troy contract was so mixed with foreign matter that the plaintiff justifiably rejected the last shipment of it, for which the government sought recovery. Accordingly, the judgment dismissed the original complaint and both the plaintiff's counterclaim and the defendant's counterclaim. Both parties appealed but the appeal of the defendant has been withdrawn.

The case was tried upon a stipulation of facts as to the Chicago contract and upon the deposition of the president of the plaintiff as to the Troy contract.

### The Chicago Contract.

This material was at the plant of the Dryden Rubber Company, at Keokuk, Iowa, and was described in the contract as 15,000 pounds of "⅞ used elastic head harness from gas mask in three crossing strips, sewed together. Has iron clinch tip on each of six ends." Its condition was designated by the numeral "6," the meaning of which was unknown to the plaintiff. The contract was on Form No. 921 R. A. of the Treasury Department, Procurement Division, and bore the notation "Sheet No.  .

1 of 1 Sheets" at the top. It was signed in behalf of both the buyer and the seller at the bottom of that page. On the back there was printed matter. The last paragraph consisted of directions to the custodian of the goods sold to deliver them to the buyer upon the buyer's signing in the blank provided beneath the words "Delivery made and property accepted." There was also a blank for the signature of the contracting officer authorizing the delivery. There were, however, no signatures on the back. The remainder of the printed matter consisted of four numbered "conditions," only the first of which is of concern now. That read, "All property is sold 'as is' and 'where is' without express or implied warranty of any kind." It was this condition which the court held bound the plaintiff and precluded its recovery, and decision as to that contract turns upon the correctness of this holding.

In this connection a little of the background will be helpful. The Chicago contract was not the first dealing the plaintiff had had with the government in respect to such war surplus elastic webbing material, or indeed with such material at the Dryden Rubber Company's factory. On October 12, 1944 the plaintiff offered to purchase, pursuant to a written contract executed by it and the contracting officer of the Chemical Warfare Service, United States Army, for delivery by the government to it, f. o. b. Keokuk, Iowa, the following:

"Scrap Elastic Head Harness Webbing, three crossing straps with clinch tips but without pyroxylin coated cloth centerpiece: To be baled or packed in corrugated boxes w/o sweepings. Total accumulation for 90 days plus 15,000 lbs. now available. * * *"

This contract expressly provided, in the body thereof, that the buyer should accept the property "as is" at time of delivery and without any guaranty or warranty of any kind, and the purchase price was 78 cents a pound. The contract was disapproved by order of the Chief of Chemical Warfare Service in Washington. On October 20, 1944, the plaintiff was so notified, the checks it had given were returned

to it, and it was further advised that the "elastic webbing is being declared to the Treasury Department, Procurement Division, to be sold by negotiation." Thus this contract never became effective.

On October 30, 1944, the plaintiff wrote the Surplus Goods Division of the Treasury at Chicago, which will be called the Chicago Office, that his "offer to the Boston and Chicago Chemical Warfare Procurement Division for some Head Harness Elastic Webbing Scrap" had been declined; that he had been informed "that this elastic webbing as mentioned above has been referred to your office for disposal"; and requested "full information on this as soon as you are ready, as I am prepared to make a cash offer for the entire lot."

The Chicago Office wired the plaintiff in reply that it had 15,000 pounds of head harness elastic webbing material for sale at Keokuk, Iowa. The plaintiff immediately requested that a sample be mailed to it and two samples were mailed on November 8, 1944. These samples were taken from ten pounds of samples which had been sent to the Chicago Office from Keokuk and were two elastic head harnesses consisting of three crossing sewn straps each 15 inches long with clinched tips in clean, dry and straight condition without any pyroxylin coated cloth centerpieces. After receiving and inspecting the samples, the plaintiff on November 15, 1944, offered 45 cents a pound for "whatever you have on hand ready, like for instance 15,000 to 20,000 lbs. and we will also accept any additional quantities that you may assemble." Failing to receive a reply to this offer, the plaintiff on November 27, 1944, wrote to the Chicago Office requesting a reply and was told in a letter two days later that its offer was "still under advisement, but if you are greatly interested, we would suggest that you increase your bid." The bid was not increased but the offer was accepted, and the Chicago contract dated December 5, 1944, was executed. The plaintiff paid the contract price of $6750.00 on December 18, 1944. Meanwhile, someone in the Chicago Office had apparently discovered that the 15,000 pounds of elastic scrap at Keokuk

was soiled, for on November 20, 1944, it was offered as "soiled" to eighty-four prospective bidders, although the plaintiff was not one of them.

On January 8, 1945, the elastic webbing was delivered to the plaintiff in New York City and was found upon inspection not to be in accordance with the samples but to be "dirty and stained, curled, twisted and wrinkled and the crossing of the straps in a substantial number of head harnesses was bound by a pyroxylin coated cloth centerpiece." On the same day the plaintiff wrote the Chicago Office that the goods did not conform to the samples or to the contract; that it elected to rescind the contract and was "holding the goods for your order and will return them to such place as may be designated by you."

There were no representations made concerning the quality and condition of the scrap in the negotiations for the Chicago contract, but the samples were of dry, straight and clean material free of pyroxylin centerpieces, just as the head harnesses had been represented in the negotiations leading up to the cancelled contract. The stipulation is silent as to whether the plaintiff knew of the previously quoted condition No. 1 on the back of the government form used in the execution of the Chicago contract. Three days after the signing of the contract, however, the plaintiff was sent a letter directing its attention to those conditions, and it made no objection. The trial judge inferred such knowledge on the part of the plaintiff from the prior dealings it had had with the government. We think the inference well justified, especially since the plaintiff had previously offered to pay 78 cents and to take it "as is" and without any warranty or guaranty whatever. In bidding for the goods covered by the Chicago contract which according to the sample were as represented in the negotiations for the cancelled contract it bid but 45 cents. As the trial judge well said, "In disposing of war surplus the Government is not engaged in normal trade and frequently is ignorant of the condition of the goods it sells. Buyers have no right to expect, have notice not to expect, and contract not to expect any warranties whatsoever. Plaintiff had such notice from his dealings and so expressly contracted in this transaction." It was also found that there was no bad faith shown on the part of the government and we again agree. The failure to send the plaintiff a solicitation for a bid describing the scrap as "soiled" when such notices were sent to many others was reasonably to be explained by the fact that the plaintiff had already made its bid. And the possibility that anyone acting for the government was deliberately representing soiled scrap to be clean is negatived by the fact that at least eighty-four prospective bidders were told it was soiled.

Consequently any implied warranty that the scrap would correspond to the sample which might otherwise have arisen was displaced by the specific agreement that there should be none. New York Personal Property Law Sec. 152; Lumbrazo v. Woodruff, 256 N.Y. 92; 175 N.E. 525, 75 A.L.R. 1017; Burntisland Shipbuilding Co. v. Barde Steel Products Corp., D. C. D. Del., 278 F. 552. Indeed, this record is instinct with the plaintiff's understanding that the government in effect was saying, "We have 15,000 pounds of elastic scrap which we think is like this sample and would like to know what you will give for it. But you will have to take it as it is and take your chances as to its condition." Under such circumstances the old common law rule of *caveat emptor* applies even now. M. Samuel & Sons v. United States, 61 Ct.Cls. 373; Sachs Mercantile Co. v. United States, 78 Ct.Cls. 801; S. Snyder Corp. v. United States, 68 Ct.Cls. 667; Maguire & Co. v. United States, 273 U.S. 67, 47 S.Ct. 274, 71 L.Ed. 540; Lipshitz & Cohen v. United States, 269 U.S. 90, 46 S.Ct. 45, 70 L.Ed. 175.

Nor does the soiled condition of the elastic webbing offer grounds for rescission for mutual mistake as to a material fact, for by the "as is" terms of the contract the parties agreed that the condition of the goods was to be immaterial. Restatement, Contracts Sec. 502.

### The Troy Contract.

Late in April, 1945, an officer of the Chemical Warfare Service, United States Army, told the plaintiff's president that the government had some "gas mask elastic pieces" to sell at the plant of Cluett, Peabody & Company in Troy, N. Y. They were represented to be clean pieces about sixteen inches long, three of which were stitched together in the center without any pyroxylin or non-elastic webbing sewn on. This led to the execution of a contract on May 7, 1945, known herein as the Troy contract, by which the plaintiff agreed to purchase scrap at 40 cents a pound and the government agreed to ship to it from time to time as it accumulated during the ninety-day life of the contract. The plaintiff paid down $1500 when the contract was executed and received two shipments, one on May 14 and the other on May 18, 1945, for which it paid on May 17 and May 21 respectively. After the second shipment arrived, both lots were inspected by the plaintiff and found not to be as represented but to be dirty, with pyroxylin coated centerpieces and mixed with much foreign matter, resembling sweepings, which was of no value. The plaintiff notified the defendant that the shipments were not in accordance with the contract, offered to return them, and demanded the return of its money. But it was told that the next lot would be as represented and was asked to put the goods aside for inspection by a representative of the government. On June 1, 1945, another shipment was received which the plaintiff found upon inspection to be not as represented and it again complained to the government. On June 18, 1945, a fourth shipment arrived. Soon after that the government's representative offered to allow the plaintiff a credit for part of the goods provided the plaintiff separated the useless part from the rest. Following that inspection and offer of credit the plaintiff, on July 24, 1945, paid in full for all the goods received. On July 31, 1931, the plaintiff received another shipment which did not conform and refused to pay for it. It was for the price of this last shipment that the government sought recovery; the plaintiff counterclaimed to recover the payments it had made. Since the government has withdrawn its appeal we pass without comment the dismissal of its counterclaim.

The right of the plaintiff to recover any of its payments because of the soiled condition of the goods is, as it was under the Chicago contract, foreclosed by the terms of its agreement. Here the contract stated:

"5. Inspection. Bidders are invited and urged to inspect the property to be sold prior to submitting bids. * * * In no case will failure to inspect be considered ground for a claim.

"6. Sale of Property 'As Is.' Unless otherwise specified, all property is sold 'as is'; the Government makes no guaranty, warranty, or representation, express or implied, as to the kind, size, weight, quality, character, description, or condition of any of the property, or its fitness for any use or purpose; this is not a sale by sample."

■ The description of what was sold was simply, "Head Harnesses." The shipments, however, contained a substantial quantity of foreign matter which did not conform to that description. The fact that a specific and existing quantity of government surplus goods had been represented to contain more conforming material than it did would not constitute a breach of a contract of sale without warranties. Lipshitz & Cohen v. United States, 269 U.S. 90, 46 S.Ct. 45, 70 L.Ed. 175; Mottram v. United States, 271 U.S. 15, 46 S.Ct. 386, 70 L.Ed. 803. Nor can the presence of the non-conforming material here be considered as creating a shortage in quantity. This sale was only of what material became available for disposal at a designated factory, without representation as to quantity.

Since the goods conforming to the contract were mixed with matter which did not conform, the last shipment was properly held to have been rightfully rejected and the preceding ones could have been rejected for the same reason. Croninger v. Crocker, 62 N.Y. 151; New York Personal Property Law Sec. 125; Uniform Sales Act Sec. 44. But instead of taking

that advantage of the government's breach the buyer elected, with knowledge of the breach and upon the assurance that a credit for the unfit goods would be allowed, to take the first four shipments and to pay the remainder of the purchase price, which it did in part by the application of the advance deposit and in part by check. The buyer thereby accepted the goods and lost the right to rescind the contract. Petersen Oven Co. v. Guarino, 221 App.Div. 146, 223 N.Y.S. 107; Scriven v. Hecht, 2 Cir., 287 F. 853; Southern Gypsum Co. v. United Paperboard Co., 4 Cir., 11 F.2d 58; New York Personal Property Law Sec. 150.

While this precludes recovery of the purchase price by rescission, the acceptance of the goods, accompanied as it was by the assertion of the right to a credit, did not bar the recovery of damages for the breach of the contract. Southern Gypsum Co. v. United Paperboard Co., supra; Herbrand Co. v. Lackawanna Steel Co., 6 Cir., 280 F. 11; New York Personal Property Law Sec. 130; Uniform Sales Act Sec. 49. Cf. Lamborn v. Northern Jobbing Co., 7 Cir., 15 F.2d 897, 898, 899. However, the appellant sought no recovery upon such a theory and failed to prove what damages had been sustained.

Ordinarily such a failure would not justify a dismissal of the complaint, for it would not preclude the recovery at least of nominal damages. But nominal damages for breach of contract are not recoverable against the United States. Grant v. United States, 7 Wall. 331, 74 U.S. 331, 19 L.Ed. 194; Marion & Rye Valley Ry. v. United States, 270 U.S. 280, 282, 46 S.Ct. 253, 70 L. Ed. 585; Sioux Tribe of Indians v. United States, 84 Ct.Cls. 16, certiorari denied 302 U.S. 740, 58 S.Ct. 139, 82 L.Ed. 572. Although this suit was brought in the district court under former Sec. 41(20) [1] of 28 U.S.C. and not in the Court of Claims, the rule is the same regardless of the forum. Cf. United States v. Sherwood, 312 U.S. 584, 589, 590, 61 S.Ct. 767, 85 L.Ed. 1058. Consequently, the appellant could

not recover without proof of what damages had actually been suffered. Hooper v. Story, 155 N.Y. 171, 49 N.E. 773; Restatement, Contracts § 331(1).

Judgment affirmed.

---

1. 1948 Revised Judicial Code, 28 U.S.C.A. § 1346.