**UNITED STATES of America,
Appellant,**

v.

**F. C. HATHAWAY, Appellee.**

**No. 15269.**

United States Court of Appeals
Ninth Circuit.

March 26, 1957.

---

Walter J. Cosgrave, Maguire, Shields, Morrison & Bailey, Portland, Or., for appellant.

C. E. Luckey, U. S. Atty., Victor E. Harr, Asst. U. S. Atty., Portland, Or., George C. Doub, Melvin Richter, Bernard Cedarbaum, Washington, D. C., for appellee.

Before HEALY, CHAMBERS and BARNES, Circuit Judges.

BARNES, Circuit Judge.

Appellee, F. C. Hathaway, brought this action in the District Court under the Tucker Act [1] to recover $10,000 in damages from the United States for alleged breach of a contract of sale, as modified, and to have the contract reformed by reducing the purchase price by one-half.[2]

---

1. 28 U.S.C.A. § 1346.

2. Although the complaint sought "reforma-

tion," it is obvious that this is not a proper case for "reformation," as that

The United States denied breach; challenged plaintiff's right to "reformation"; and counterclaimed for the unpaid balance due on the contract. The District Court granted plaintiff's prayer for a fifty percent reduction of the purchase price and entered judgment accordingly.[3] The Government here appeals from both the judgment in favor of plaintiff, and the denial of its counterclaim.

An invitation to bid on the property involved in this controversy was issued by the United States Army Corps of Engineers on March 3, 1952. The bid of plaintiff was received March 20, 1952, and accepted on that same date. The contract called for the sale to plaintiff of four sets of steel lock gates, each of two leaves, located at Cascade Locks, Oregon. These gates were situated below the level of the waters of the lake formed by Bonneville Dam. The estimated gross tonnage of the steel contained in these gates was 985.3 tons. Plaintiff's bid of $7500 for the entire lot was high. In accordance with the terms of the bid invitation, plaintiff paid a bid deposit of $1500. The balance was required to be paid prior to December 1, 1952 or prior to the removal of any property.

Plaintiff commenced salvage operations in the fall of 1952. Manpower and high water difficulties forced him to discontinue operations before any steel had been removed. The Government concedly acquiesced in this delay.

During this period plaintiff and the Contracting Officer, L. W. Bixby, entered into a purported modification of the contract whereby plaintiff would be permitted to remove salvaged steel before paying for it. The Government has steadfastly denied Bixby's authority to modify the agreement. The legal efficacy of the modification is not relevant to any issue tendered by this appeal or the decision below.[4]

In 1953 plaintiff did manage to remove to the banks of the old canal the two lock gates from the upper end of the canal, containing approximately 517 tons of steel. When the salvage operations shifted to the lower two sets of locks it was discovered that one lock (the upper of the lower two) was sprung, and that this condition, combined with the depth of the locks and the accumulated silt and debris, made the removal of additional steel economically unfeasible and too perilous for diving operations. Work on the locks was then terminated.

Thereafter, the Corps of Engineers again extended the time for payment of the purchase price and the removal of the 517 tons of steel which had been salvaged from the canal banks where it was placed, to January 4, 1954. Plaintiff tendered no further payment and made no effort to remove the steel. The Government then elected to exercise its contractual right to sell the salvaged steel which it did do for the sum of $4,-387.98.[5] This money was credited to plaintiff's account. Less than one month

term is known in the law of contracts. Reformation of a written instrument will be ordered only where the writing does not accurately express the agreement assented to by the parties. It is used to conform the writing to the true agreement. 3 Corbin, Contracts, § 614; 5 Williston, Contracts, § 1547. Here, it is not disputed that the written contract correctly states the agreement of the parties.

3. The trial court made no specific finding on plaintiff's claim for breach of contract. Both parties have construed this silence as a rejection of the claim.

4. The trial court's implied denial of the

claim for breach which claim was predicated on this purported modification of the agreement obviates the necessity for consideration of the matter by this Court.

5. The contract provided that, "If the successful bidder fails to make full and final payment as herein provided, the Government reserves the right, upon written notice to the successful bidder, to sell or otherwise dispose of any or all of such property in the Government's possession and to charge the loss, if any, to the account of the defaulting bidder." The Government properly notified plaintiff by mail of its intention to sell the salvaged steel.

later, following the last of a series of unsuccessful attempts to obtain a modification of the agreement, plaintiff instituted this action.

The court below found that the parties were mutually mistaken as to the amount of steel which it was practicably possible to remove from the old Cascade Locks; and that only one-half of the amount which the parties contemplated could be removed was in fact practicably possible of removal. Accordingly, it halved the purchase price and awarded judgment for plaintiff for $2,137.98. This figure represents the aggregate sum of the bid deposit and the amount received for the 517 tons of steel sold by the Government, $5,887.98, minus the reduced contract price of $3750.

■ The evidence is sufficient to support a finding that neither party was fully cognizant of the true condition of the lower two sets of locks when they entered into the agreement. In this limited sense it may be said that the parties were mutually mistaken as to a material factor affecting the amount of removable steel. But such a determination does not conclude the question. Mutual mistake renders a sales contract voidable only if the parties have not agreed among themselves that the risk of such mistake shall be assumed by the purchaser.[6] It cannot be doubted that the parties can control the matter by agreement.[7] A party to a contract may assume the risk of every chance occurrence.[8] The decisive inquiry then is how the burden attendant to this misconception should be allocated in light of the terms of the written agreement and the surrounding circumstances. More specifically, did one

of the parties assume the risk of such error?

■ The general sales terms and conditions of the contract provided:

"2. Conditions of Property—All property listed herein is offered for sale 'as is' and 'where is,' and without recourse against the Government. * * * The description is based on the best available information, but the Government makes no guaranty, warranty, or representation expressed or implied, as to quantity, kind, character, quality, weight, size, or description of any of the property; or its fitness for any use or purpose, and no claim will be considered for allowance or adjustment or for rescission of the sale based upon failure of the property to correspond with the standard expected; this is not a sale by sample."

The Special Conditions in the contract read as follows:

"Property is sold 'as is, where is'. In subsequent disposal by the contractor of any scrap purchased hereunder, disposal of such scrap shall be subject to allocation by the National Production Authority, U. S. Department of Commerce, or other comparable Government Agency, in conformance with existing law.

"Attached hereto is print covering recent hydrographic survey of the old locks showing approximate height of water, approximate positions of various gates and silting condition at bottom of locks.

"Interested bidders may examine print showing design of gates and

---

6. Restatement of Contracts, §§ 456, 502, Comment f; Corbin, Contracts, §§ 598, 1354.

7. Lipshitz & Cohen v. United States, 269 U.S. 90, 46 S.Ct. 45, 70 L.Ed. 175; American Elastics, Inc., v. United States, 2 Cir., 187 F.2d 109; Sachs Mercantile Co. v. United States, 78 C.Cls. 801; General Textile Corp. v. United States, 76 C.Cls. 442; Yankee Export & Trading Co. v. United States, 72 C.Cls. 258; Sil-

berstein & Son v. United States, 69 C.Cls. 412; Snyder Corp. v. United States, 68 C.Cls. 667; Panama v. United States, 63 C.Cls. 283; Triad Corp. v. United States, 63 C.Cls. 151. See also, De La Rama S.S. Co. v. Ellis, 9 Cir., 149 F.2d 61, and, Triple "A" Machine Shop, Inc., v. United States, 9 Cir., 235 F.2d 626.

8. Day v. United States, 245 U.S. 159, 38 S.Ct. 57, 62 L.Ed. 219; Restatement of Contracts, § 288, Comment b.

manner in which they are secured to lock walls by applying at 678 Pittock Block."

The Government was not in the business of selling steel, and did not intend to enter it. In effect the Government told prospective purchasers that it had a quantity of surplus steel for sale; that it simply desired to dispose of this surplus; but that it did not want to accept responsibility for the inherent risks involved in an operation of this magnitude. Therefore, it proposed to sell the entire lot of steel regardless of amount, condition or location, on an "as is, where is" basis. Recourse against the Government was explicitly negatived.

Prospective buyers were informed that the locks were located beneath the water surface. They were urged to inspect the locks before bidding and admonished by the express language of the contract that the Government would not bear the responsibility of failure to inspect.[9] Ample opportunity was afforded for this purpose.

As stated in Restatement of Contracts, § 288, Comment b,

"Since it is possible for a party to a contract to assume the risk of every chance occurrence, a fair interpretation of a contract may indicate an intention to be bound to perform or to pay damages for nonperformance whatever contingencies may occur."

That is precisely the situation presented by the instant case. One can hardly envisage contractual terms which could more clearly impose on the purchaser the risk of loss resulting from such contingencies as here occurred. This was the very essence of the bid invitation. The Government's manifested intention was to shift the burden of responsibility for any fortuitous conditions which might arise upon the bidder. There can be no other interpretation given the plain and unequivocal terms of the bid invitation.

■ A fundamental rule of construction is that a court must give effect to every word or term employed by the parties and reject none as meaningless or surplusage in arriving at the intention of the contracting parties. Bankers Life Co. v. International T. & T. Corp., 7 Cir., 239 F.2d 621; Shell Oil Co. v. Dye, 7 Cir., 135 F.2d 365. The decisions have applied this rule to the Government's "as is, where is" contracts. Maguire & Co., v. United States, 273 U.S. 67, 47 S.Ct. 274, 71 L.Ed. 540; Lipshitz & Cohen v. United States, 269 U.S. 90, 46 S.Ct. 45, 70 L.Ed. 175; United States v. Silverton, 1 Cir., 200 F.2d 824; American Elastics, Inc., v. United States, 2 Cir., 187 F.2d 109.

Plaintiff does not now, nor has he ever maintained, that the agreement is or was unclear, or that he misunderstood the meaning thereof. If plaintiff entertained compunctions about entering into contractual relations on this basis; if he had any doubts or qualms concerning the practicability of salvaging the steel; such considerations should have been weighed and determined before reaching the decision to bid. He could have taken precautions to moderate the risks, but he did not. He made no inspection before submitting his bid. This, despite the fact that he was totally inexperienced in marine salvage operations.

■ Nor does plaintiff question the validity of the exculpatory clauses. There is no evidence of fraud, overbearing, superior knowledge or such unfairness as to make this agreement voidable. The Government made no representation respecting the amount of removable steel. The figure 985.3 gross tons was an estimation, not a representa-

---

9. Condition 1. of Contract:
"1. Inspection.—Bidders are invited and urged to inspect the property to be sold prior to submitting bids. Property will be available for inspection at the places and times specified in the Invita-

tion. The Government will not be obliged to furnish any labor for such purpose. In no case will failure to inspect constitute grounds for a claim or for the withdrawal of a bid after opening."

tion. "The naming of quantities cannot be regarded as in the nature of a warranty, but merely as an estimate of the probable amounts in reference to which good faith only could be required of the party making it." Lipshitz & Cohen v. United States, supra, 269 U.S. at page 92, 46 S.Ct. at page 46; Maguire & Co. v. United States, supra, 273 U.S. at page 69, 47 S.Ct. at page 274. Moreover, it is admitted that the estimate was substantially accurate as to the amount of steel actually contained in the lock gates.

On oral argument counsel for plaintiff laid particular emphasis on the contents of a hydrographic chart which accompanied the bid invitation. This chart showed the approximate height of the water, approximate positions of the various gates and estimated silting condition at the bottom of the locks. It was composed (as is clearly stated on the chart) from lead-line soundings. The primary purpose of such a survey is to check the depth of underwater installations and obstructions. Accordingly, no sub-surface investigation other than the lead-line soundings was undertaken in the preparation of this data. When completed, the chart did not indicate that the lower gates were sprung and silted over. This is not surprising in view of the limited nature of the survey. However, plaintiff cannot rely on the omission. Not only does the express statement of the limited nature of the survey, contained therein, and the Government's express disavowal of any representation in the bid invitation (Condition 2, supra) preclude such reliance, but so also does plaintiff's own failure to inspect, either below or above the water line. Moreover, plaintiff's expert witness, Lewis Smith, who conducted diving operations for plaintiff, testified that the chart was substantially correct and that the chart accurately reflected the silting condition.

Although the overwhelming majority of cases having to do with "as is, where is" contracts concern the dismissal of actions for breach of contract or warranty, there is one decision directly in point. In American Elastics, Inc., v. United States, supra, the plaintiff sued to rescind a contract for the sale of surplus elastic webbing material and to recover the purchase price which he had paid. The action was grounded on mutual mistake. The alleged mistake was that the delivered material was soiled. The Second Circuit, in denying rescission, held that the "as is" terms of the agreement barred an action on this theory. We agree. And if the contract cannot be rescinded, the Government is entitled to enforce it.

Plaintiff bought on a "grab bag" basis. The very term "as is, where is" tells the buyer to beware—to investigate. Plaintiff was aware that risks existed. He ventured and lost. His bargain was bad. However, the law provides no remedy for bad bargains willingly risked with wide opened eyes.

The determination that plaintiff assumed the risk of the conditions which impaired the removability of all the steel answers not only the question as to his rights but also the matter of his duties. Just as the vicissitude of the sprung lock and the accumulated silt does not bestow any rights in him neither does it absolve him of his obligations. This is not a case of either impossibility or commercial frustration justifying excuse from performance, for plaintiff assumed the risk of the difficulties he encountered. There is no dispute that the unpaid balance due on the contract is $1,612.02. Accordingly, judgment should be entered for this sum on the Government's counterclaim.

Because of our holding that plaintiff cannot recover, we are not required to reach the question of whether or not the particular relief granted plaintiff by the District Court was proper.

The judgment for plaintiff is reversed and the cause remanded to the District Court with directions to enter judgment for appellant on its counterclaim.