**PATRICK PETROLEUM CORPORA-TION OF MICHIGAN,**
**Plaintiff-Appellee,**

v.

**CALLON PETROLEUM COMPANY,**
**Defendant-Appellant.**

**No. 75–1461.**

United States Court of Appeals,
Fifth Circuit.

May 24, 1976.

Rehearing and Rehearing En Banc
Denied July 2, 1976.

Dale H. McKibben, Jackson, Miss., for defendant-appellant.

Walker L. Watters, Jackson, Miss., for plaintiff-appellee.

Before WISDOM, GODBOLD and LIVE-LY,* Circuit Judges.

GODBOLD, Circuit Judge.

A seller and a buyer of gas well interests agreed on a damage formula to cover possible mistakes in the transaction. A highly material mistake of fact underlying the contract came to light. Should a court grant rescission under the principle that when parties enter into a contract as the result of a mutual mistake about a material fact, a court of equity may set the contract aside? Or should the court enforce the contractual damage provision? That is the question presented by this Mississippi diversity case.

I

Callon Petroleum Company [1] sold to Patrick Petroleum Corporation of Michigan [2] a presently existing partial interest in a gas well in Walthall County, Mississippi, and a reversionary interest in three additional gas wells. The sale was in the form of an assignment, and the price (excluding brokerage fees) was $50,000. By the terms of the trade, Patrick was to receive an interest immediately in the Gartman well. It was

---

* Of the Sixth Circuit, sitting by designation.

1. Then known as the Cane Corporation.

2. Then Patrick Petroleum Company.

to receive an interest in each of the other three wells—McDonald, Willie Moses, and Needham-Jones—after they had reverted back from Ada Oil Co. (Ada), an earlier assignee of Callon's. Reversion of each well would take place, or so the parties believed, when Ada had attained payout for that particular well, that is, after proceeds from the sale of gas had restored to Ada 100% of its cost in purchasing the leases and in testing, completing, and operating the well.

Negotiations began in October 1970 and extended over about three months' time. On January 18, 1971, Dale McKibben, Callon's attorney, prepared a title opinion for Patrick certifying that Callon owned a reversionary interest in the Needham-Jones well. He based this opinion on a letter agreement between Callon and Ada, dated March 14, 1969. Patrick made no independent investigation into the validity of Callon's title with respect to any of the wells.

On January 20, 1971, representatives of both sides met to discuss the sale. Callon was ready to close, but Patrick's attorney, Martha Gerald, was unwilling to accept the assignments as written. She asked that the agreement be amended so that it would include specific legal descriptions of the interests being conveyed and a warranty that Callon owned them. Because of her request, and for other reasons, the sale was not consummated at that time.

The next day McKibben and Gerald conversed several times by telephone in an attempt to resolve their differences. They finally agreed that the warranty required by Gerald could be provided in a separate instrument rather than by revising the previously executed assignments. McKibben thereupon dictated a proposed "Supplemental Agreement" to Gerald's secretary. Gerald made revisions in the transcribed copy of this agreement, and the two sides signed her final text. The sale was completed a few days later.

The Supplemental Agreement described the exact boundary lines of the four wells in which interests were being conveyed and warranted the percentage of net revenue that Patrick was to derive from each. Added together, these four percentages totalled about 17%. The Supplemental Agreement went on to state that if the warranty was breached as to any well, Patrick's recovery would be limited to a partial refund of the purchase price. The proportion to be refunded would be determined by taking the percentage of revenue that Callon had tried to convey in the well affected by the breach and dividing it by 17, the total of the percentages. Thus, since the total purchase price (exclusive of brokerage fees) was $50,-000, Callon would be liable under the formula for approximately $3,000 for each percentage point of net revenue interest that Patrick failed to realize. The Supplemental Agreement added: "By the acceptance of the assignments herein mentioned, and this agreement, the Assignee concurs as to the measure and means of apportionment of the loss in the event of failure of title of Assignee in whole or in part. . . ."[3]

About a year later the parties discovered that they had made an error with respect to

---

**3.** After stating the boundary lines of the properties and warranting the percentage of net revenue interest to be earned on each well, the Supplemental Agreement reads as follows:

"The parties hereto further agree that in the event of a breach of said warranty, the recovery of Patrick Petroleum Company shall be limited to a return of a proportionate part of said consideration based upon the sum of $2,941.89 for each one percent of the total of 16.99587 percent interest conveyed.

"[Callon] warrants the interests conveyed only to the extent of the return of the purchase price as above determined. Thus, should the title so conveyed fail, and Assign-

ee shall not receive net revenue interest in the production from any well from the pipeline purchasers of the gas in the percentages herein represented and warranted that it should receive, Assignor will refund a pro-rata part of the purchase price based upon the formula herein set forth, regardless of the well or wells wherein the shortage or a loss might be.

"By the acceptance of the assignments herein mentioned, and this agreement, the Assignee concurs as to the measure and means of apportionment of the loss in the event of failure of title of Assignee in whole or in part, but this shall not be construed as

the Needham-Jones well. That well, it turned out, was not covered by the March 14, 1969, agreement between Callon and Ada, as McKibben's title opinion had stated, but rather by a later agreement between those two companies made in 1970. Under the 1969 agreement, the right to receive proceeds from the sale of gas from any particular well would revert from Ada to Callon when Ada had reached payout for that well. This agreement did cover the McDonald and Willie Moses wells, as Callon had warranted when it had assigned its rights to Patrick. But under the 1970 agreement, which pertained to the Needham-Jones well, no reversion would occur until Ada had reached payout for all of its oil extraction operations within a rather large, specifically defined territory in Walthall County. No evidence suggests that the error was anything but innocent. It appears that when Callon and Patrick made their contract neither of them, nor even Ada, realized that the reversion of interests in the Needham-Jones well would be delayed so long. Nevertheless, when the mistake came to light it was immediately clear, and it is undisputed now, that Callon's warranty to Patrick had been breached.

Patrick promptly wrote to Callon, requesting rescission of the contract. Callon refused, claiming that it was protected by the Supplemental Agreement. Under the formula in that agreement only about 1½% of the assets conveyed by Callon were allocable to the Needham-Jones well. Accordingly, Callon took the position that Patrick was entitled to only $843.90 out of the $50,000 purchase price.

Patrick brought suit for rescission and prevailed in the District Court. In testimony that the District Judge evidently credited, Patrick's officers claimed that they had

viewed the Needham-Jones well interest as the most valuable in the "package deal" and that they would not have signed the contract if they had known the nature of Callon's title to that well.[4] The District Judge relied on authorities stating generally that in a proper case equity will rescind a contract procured by fraud, misrepresentation, or mutual mistake. He indicated that a proper case for equitable relief would be one in which the plaintiff had no adequate legal remedy, and he held that Callon's tender of $843.90 was a totally inadequate remedy at law. Callon appeals from the judgment of rescission.

## II

It is unquestioned that if Patrick had sued Callon on a breach of contract theory, its recovery would have been $843.90. The Supplemental Agreement set forth a precise formula for computing the assignee's damages in the event that title failed. Title did fail. In this situation a court will ordinarily award the damages fixed by the contract and no more, without regard to whether the promisee's actual damages were different. The explanation for this rule is that the nonbreaching party is deemed to have assumed the risk that he would lose under the formula; his willingness to take that risk is viewed as one of the elements of the parties' bargain. As Professor Corbin writes:

> [W]ith certain exceptions, the courts see no harm in express agreements limiting the damages to be recovered for breach of contract. Public policy may forbid the enactment of penalties against a defendant; but it does not forbid the enforcement of a limitation in his favor. . . . Where a contract provides that damages for breach shall not be recoverable beyond a specified sum, it is obvious that

---

an evaluation of the respective interests so acquired for any other purpose."

4. According to Patrick, several factors combined to make the mistake as to the Needham-Jones well "material" enough to vitiate the contract. First, Patrick wanted to purchase several wells at once, so that it could "spread its risk." Removing any well from the package would thus have sharply reduced or eliminated

Patrick's desire to strike a deal. Second, the Needham-Jones well was the most attractive well in the package, because its physical characteristics made it the equivalent of two wells for practical purposes. Moreover, the Needham-Jones was expected to pay out considerably earlier than either the McDonald or the Willie Moses, thereby producing income within a short time after the sale.

the risk of loss beyond that sum is being assumed by the promisee.

5 Corbin on Contracts § 1068 at 386 (1964) (footnote omitted).[5]

The Mississippi Supreme Court demonstrated its adherence to these principles in *Garber v. Wright Cast Stone Co.,* 167 Miss. 37, 146 So. 449 (1933). Wright was a subcontractor that fell behind schedule in its deliveries of stone to Garber, a general contractor constructing buildings for the state university. The contract between the parties, as construed by the court, provided that in case of delay Wright would be liable for $50 per day or for the amount that Garber was fined by the state, whichever was less. Garber's actual damages stemming from the delay (i. e., the expense of paying idle work crews and maintaining equipment at the construction site) were about $4,700, but since the state had imposed no fines on account of delay, the Mississippi Supreme Court held that Garber could recover nothing from Wright.

The Supplemental Agreement formula derives additional strength from the fact that it can properly be viewed as a liquidated damages provision. A bona fide liquidated damage clause—one that fairly attempts to predict the damages that would flow from a breach of the contract—is generally enforceable in Mississippi courts. See *Vanlandingham v. Jenkins,* 207 Miss.

882, 43 So.2d 578 (1950); *Palmer v. Chandler,* 158 Miss. 604, 131 So. 104 (1930); *Brown v. Staple Cotton Co-op. Ass'n,* 132 Miss. 859, 96 So. 849 (1923); *Hardie Tynes Foundry & Machine Co. v. Glen Allen Oil Mill,* 84 Miss. 259, 36 So. 262 (1904). To be sure, the formula here was a crude one. The potential damages allocable to each well were to be dictated by the mechanical formula that we have described, even though the formula took no account of the possibility that a tiny fractional interest in an excellent well might be worth more than a sizeable fractional interest in a mediocre well.[6] Nevertheless, as the District Judge recognized, the respective values of the well interests were wholly conjectural at the time of sale. Such is the nature of the oil extraction industry. Moreover, there is nothing in the record to indicate that the parties could reasonably have been expected to adopt a more reliable yardstick. Where it is inherently difficult to approximate the actual damages that a breach will cause, the courts tend to be particularly indulgent of contractual provisions that prescribe a crude but convenient liquidation of the parties' rights. See *Brown v. Staple Cotton Co-op. Ass'n, supra; Shields v. Early,* 132 Miss. 282, 95 So. 839 (1923).[7]

### III

Patrick's brief concedes that the rules we have summarized would be controlling if

**5.** The exceptions to which Corbin refers are situations in which the parties' agreement is viewed as a contract of adhesion or as otherwise unconscionable. For the reasons stated in the text following footnote 10 *infra,* we do not regard the Supplemental Agreement as a contract of adhesion.

In awarding rescission the District Judge necessarily balanced the equities between Patrick and Callon and concluded that justice required a cancellation of the contract. He did not, however, go so far as to hold the contract invalid under a generalized "unconscionability" test, and we think the facts of the case would not have supported such a finding. *See Terre Haute Cooperage, Inc. v. Branscombe,* 203 Miss. 493, 35 So.2d 537, 541 (1948) (defining an unconscionable contract as "one such as no man in his senses and not under a delusion would make on the one hand, and as no honest and fair man would accept on the other").

**6.** Patrick argues that the formula was indeed inaccurate in this respect. Patrick's engineer testified that he had regarded the Needham-Jones well interest as being worth about one-third the value of the total package.

**7.** The Mississippi case law on liquidated damages is largely devoted to a continuing effort to distinguish between "true" liquidated damage clauses, which are enforceable, and "penalty" clauses, which are not. Generally clauses struck down as "penalties" are those which appear to have been inserted as an *in terrorem* device to deter the promisor from breaching his agreement, rather than as a means of compensating the promisee for anticipated loss. *See Continental Turp. & Rosin Co. v. Gulf Naval Stores Co.,* 244 Miss. 465, 142 So.2d 200, 209 (1962); *Shields v. Early, supra,* 95 So. at 841; 22 Am.Jur.2d *Damages* § 213 (1965). Insofar as this aspect of liquidated damages doctrine may be relevant, we note that the parties in the

Patrick had affirmed the contract and sued for breach of warranty. But, instead, Patrick disaffirmed the contract and sought rescission, and that remedy is said to be governed by wholly different considerations.

Patrick seeks to bring this case within the general rule stated in *Allen v. Luckett,* 94 Miss. 868, 48 So. 186 (1909);

> [Rescission of a contract may be awarded] if the transaction was the result of a mutual mistake. If the terms are stated according to the intent of the parties, but there is an error of one or both in respect to the thing to which these terms apply— its identity, situation, boundaries, title, amount, value, and the like—then it is elementary that a court of equity may grant appropriate relief, provided the fact about which the mistake occurs was a material element in the transaction.

See also *Wall v. Wall,* 177 Miss. 743, 171 So. 675 (1937); *Powell v. Plant,* 23 So. 399 (Miss.1898). The facts of *Jones v. Metzger,* 132 Miss. 247, 96 So. 161 (1923), illustrate this rule. The *Jones* plaintiffs contracted to buy a piece of property with a house and a barn on it. They then discovered that they and the seller had been mistaken—the buildings were actually on someone else's land. The error was held to justify rescission. In the same way, Patrick maintains, the mistake as to Callon's interests in the Needham-Jones well was one affecting the essence of the agreement, to the extent that Patrick would not have entered into the sale if it had known the truth. Rescission is therefore said to be equally appropriate here.[8]

■ Insofar as Patrick's contention presupposes a rigid distinction between principles of legal and equitable relief, we reject it. Of course, a court exercising equity powers is not always obliged to enforce a contract according to its terms, and this observation is as true of liquidated damage clauses as of other provisions. At the same time, principles of "legal" relief are not to be ignored either. Under the law of Mississippi, "[i]t is quite clear that parties may agree to liquidated damages and that equity will recognize and enforce that agreement if it is reasonable and proper under all the circumstances of the particular case . . . ." *Massman Construction Co. v. City Council,* 147 F.2d 925, 928 n.2 (CA5, 1945), quoting *Chicago Investment Co. v. Hardtner,* 167 Miss. 375, 148 So. 214, 217 (1933).

■ We have concluded that the Supplemental Agreement effects a critical shift in the posture of the case, so that it becomes inappropriate to analyze the problem within the rubric of "mutual mistake about a material element of the transaction." Professor Corbin's treatise is again instructive:

> When a contractual promise is aleatory in character, the performance being expressly made conditional upon an uncertain and hazardous event, the promisee bets that it will happen and the promisor that it will not. The consideration exchanged for such a promise varies in proportion to their opinions as to probability. They consciously assume the risk. If the event occurs, or occurs sooner than the promisor expects, he is a loser; if it fails

---

instant case clearly envisioned that any payments to Patrick under the Supplemental Agreement would serve to compensate it for losses suffered by reason of the breach. Indeed, to use the Supplemental Agreement in order to "terrorize" Callon into full performance would have been absurd, since after the closing the parties had nothing left to do under the contract.

8. More precisely, Patrick asserts, and the District Court held, that this case is like those in which Mississippi courts have allowed rescission on account of "fraud, misrepresentation, or mistake." The argument that fraud can

justify rescission is irrelevant here, since there is no evidence from which fraud can be inferred. Patrick does say that Callon engaged in a "misrepresentation," albeit a wholly innocent one, in that the seller's warranty was not in accord with the truth about Callon's title. But if "misrepresentation" means nothing more than a nonculpable misstatement of facts, it would seem analytically indistinguishable from "mistake". Our discussion of whether rescission can be justified on a mistake theory is thus dispositive of the entire case.

to occur, or occurs later than the promisee expects, it is he who is loser. The opinion of one of them is thus shown to have been erroneous; but his mistake is not ground for rescission, because he consciously assumed the risk. . . . *The same result obtains in any case where the risk of some factor or of the occurrence of an event is consciously considered in agreeing upon terms. There is no mistake; instead, there is awareness of the uncertainty, a conscious ignorance of the future.*

3 Corbin on Contracts § 598 at 584–86 (1960) (emphasis added).[9] An agreement to let one party shoulder the entire risk of a particular future event is entitled to no greater respect than an agreement to divide damages in rough proportion to their likely actual incidence. If the former will preclude rescission, *a fortiori* the latter should also. We see no distinction in the fact that the title defect was theoretically knowable when the contract was signed, rather than being a "future" event in a strict sense. The intricacies of title examination are such that many land transactions must proceed despite the possibility that a title defect will come to light. Since Patrick does not deny that Callon's attorney made a reasonable inquiry into his client's power to make the desired conveyance, we think the parties could properly have regarded the possibility of title failure as a mere contingency.

Holding Patrick to its agreement will mean that it will have lost a considerable sum of money on its deal with Callon. The McDonald and Willie Moses wells never did reach payout status. As the District Court observed, "the ultimate history of the wells shows the plaintiff made a poor bargain." But under other circumstances the formula might have proved as beneficial to Patrick as it actually was detrimental. For example, if the mistake in title had affected the unprofitable McDonald well rather than the Needham-Jones well, Patrick would never have missed its lost right to a portion of the McDonald well's revenues, but the formula would have entitled it to recover nearly half the total purchase price.

Since cases like *Massman* and *Chicago Investment Co.* properly instruct the courts to take account of "all the circumstances of the particular case," we emphasize limitations in today's decision. A different question would have been presented if the contract language had not been so obviously directed at the precise sort of breach that did occur—failure of title. Moreover, this is not a case in which there is any real doubt that the parties knowingly and freely agreed to the limiting clause. The critical paragraphs of the Supplemental Agreement were extensively rewritten by Gerald, Patrick's attorney.[10] The District Court called these changes merely "editorial". Even if

---

**9.** *Accord,* Restatement of Restitution § 11(1) (1937): "A person is not entitled to rescind a transaction with another if, by way of compromise or otherwise, he agreed with the other to assume, or intended to assume, the risk of a mistake for which otherwise he would be entitled to rescission and consequent restitution." *See also, e. g., McNamara Construction of Manitoba, Ltd. v. United States,* 509 F.2d 1166, 1168 (Ct.Cl., 1975); *United States v. Hathaway,* 242 F.2d 897, 899 (CA9, 1957).

**10.** Gerald's version, which appears in footnote 3 *supra,* should be compared with the following language, taken from the draft text that McKibben had proposed:

"[Callon] further covenants and agrees that the consideration received for the conveyances above listed was $50,000.00, which is $2,941.89 for each one percent of the total of 16.99587 percent interest conveyed.

"The undersigned warrants the interests conveyed only to the extent of the return of the purchase price as above determined. Thus, should the Assignee not receive net revenue interest in the production from any well from the pipeline purchasers of the gas in the amounts herein represented that it should receive, Assignor will refund only a pro-rata part of the purchase price based upon the forms herein set out, regardless of the well or wells wherein the shortage or a loss might be.

"By the acceptance of the assignments herein mentioned, and this agreement, the Assignee concurs in the representation as to the interests acquired, and as to the measure and means of proportionment of the loss should the assignments as delivered not effectively convey good title, all of the interests that are represented to be conveyed."

we accept that characterization, Patrick cannot plausibly assert that Gerald paid no attention to the damage limitation, as if it were fine print on the back of a standardized form. Finally, this is not a case in which the contracting parties possessed unequal bargaining power. A party that lacked any real choice whether to accept or reject a contractual limitation on liability could hardly be said to have voluntarily assumed the risk of large losses. Here both buyer and seller were represented by sophisticated counsel.

As we have just endeavored to suggest, the issue posed at the beginning of this opinion has many potential complications.[11] On the present record, however, it is clear that the Supplemental Agreement must be enforced according to its terms and that the District Court erred in granting rescission.

The judgment is REVERSED and the case is REMANDED for further proceedings not inconsistent with this opinion.

11. For a comprehensive discussion of the general problem treated in this opinion, see Macneil, *Power of Contract and Agreed Remedies,* 47 Cornell L.Q. 495, 499–513 (1962).