**AMERICAN ELASTICS, Inc. v. UNITED STATES.**

Civ. 36–145.

United States District Court S. D. New York.

Jan. 19, 1949.

Gordon, Brady, Caffrey & Keller, New York City (Leo Brady, Leroy C. Curtis, New York City, of counsel), for plaintiff.

John F. X. McGohey, U. S. Atty., Harold Raby, Asst. U. S. Atty., New York City, for defendant.

RIFKIND, District Judge.

Plaintiff is a dealer in elastic material. Its action against the defendant is for the recovery of monies paid by plaintiff to defendant as the purchase price of elastic webbing material bought by plaintiff under a contract referred to herein as the "Chicago" contract. Defendant counterclaimed for the unpaid balance of the purchase price of elastic it sold plaintiff under another contract, the "Troy" contract. Plaintiff thereupon counterclaimed for all monies it had paid under the "Troy" contract. In each case plaintiff claims rescission for mutual mistake or breach of warranty in a sale by description and by sample. The facts are undisputed.

The Chicago Contract.

Defendant, through the Chemical Warfare Service, U. S. Army, offered for sale 15,000 pounds of elastic material located at Keokuk, Iowa. Plaintiff bid 78 cents a pound. A contract, dated October 12, 1944, was executed by both parties wherein the goods were described as "Scrap Elastic Head Harness Webbing; three crossing straps with clinch tips but without pyroxylin coated cloth centerpiece. To be baled or packed in corrugated boxes w/o sweepings." The contract further stated: "The Contractor agrees to accept all property purchased hereunder 'as is' at the time of delivery. The Government makes no guaranty, warranty or representation of the number, quantity, kind, size, weight, quality, character, description or condition of the material or of its fitness for any particular purpose." On October 20, 1944, the Chemical Warfare Service notified plaintiff that the contract had been disapproved, presumably by competent authority. The Chemical Warfare Service also told plaintiff that all head harness elastic webbing scrap was being declared to another agency, the Treasury Department, at its Chicago and Boston offices.

Plaintiff thereupon inquired of the Chicago Treasury office for information and was told it had for sale "15,000 Pounds Head Harness Elastic Webbing Located Keokuk, Iowa." Plaintiff requested a sample, which was furnished from a 10 pound lot of samples sent by the Chemical Warfare Service to the Treasury agency. Unknown to either agency of defendant, this sample was not representative of the goods. It was clean, dry and straight without pyroxylin coated cloth centerpieces. On November 14, 1944, plaintiff, by letter, bid 45¢ a pound for the entire lot of "Head Harness Elastic Webbing Scrap". On November 20, 1944, before accepting plaintiff's bid, the Treasury agency circularized 84 dealers in similar goods, but not the plaintiff, with an invitation to bid, describing the goods as "7/8" used elastic headharness from Gas Masks in three crossing strips sewed together. Has iron clinch tip on each of six ends." Under the heading "Condition" appeared the word "Soiled". None of their bids was as high as plaintiff's. Thereupon plaintiff and defendant executed a contract, drawn by defendant, in which the goods were described as "7/8" used elastic head-harness from gas mask in three crossing strips, sewed together. Has iron clinch tip on each of six ends." Under the heading "Condition" appeared the numeral "6" What this meant and whether plaintiff knew what this meant were not proved. The contract was of one sheet, subscribed at the foot of the first side. On the reverse side of the sheet under the heading "conditions" was printed: 1. All Property is Sold "As Is" and "Where Is" without Express or Implied Warranty of Any Kind. After plaintiff paid for the goods, and pursuant to its request, defendant shipped the goods to

plaintiff. Upon arrival they were found to be "dirty and stained, curled, twisted and wrinkled and the crossing of the straps is bound by a pyroxylin coated cloth centerpiece". They did not conform to the sample, but they did correspond to the contract description: "7/8" used elastic head-harness from gas mask. in three crossing strips, sewed together. has iron clinch tip on each of six ends."

Plaintiff elected to rescind the sale and promptly demanded return of the purchase price, holding the goods for defendant's account. Defendant refused.

■■■ In a sale by sample there is an implied warranty that the goods shall correspond to the sample. N.Y.Personal Property Law, McKinney's Consol.Laws, c. 41, § 95; Ill.Rev.Stat. Chap. 121½, § 14; Uniform Sales Act, § 14. Like any right, duty or liability arising by implication of law out of a contract of sale, this may be negatived by specific agreement. N.Y. Personal Property Law, § 152; Ill.Rev. Stat. Chap. 121½, § 71; Uniform Sales Act § 71; Lumbrazo v. Woodruff, 1931, 256 N.Y. 92, 175 N.E. 525, 75 A.L.R. 1017. Assuming that we have here a sale by sample, plaintiff cannot recover for discrepancy between sample and goods delivered because the contract it made negatived any warranty, express or implied.

To the extent that the sale was by description, there was no breach. The goods delivered corresponded to their description in the contract.

■■ While no representations of quality were made by the Treasury agency with respect to the Chicago contract here involved, it had been represented to plaintiff by the Chemical Warfare Service during negotiation of the prior, cancelled contract that the goods were free of pyroxylin centerpieces and were dry, straight and clean. This was incorrect. But had that prior contract not been cancelled, and were this action brought thereon, the plaintiff could not recover, for an "as is, where is", no warranty, Government war surplus sales contract has consistently been interpreted to be governed by the maxim "Caveat Emptor". Cf. Sachs Mercantile Co. v. United States, 1934, 78 Ct.Cl. 801; S. Sny-der Corporation v. United States, 1930, 68 Ct.Cl. 667; M. Samuel & Sons v. United States, 1925, 61 Ct.Cl. 373.

The stipulated facts do not support a finding of bad faith on part of defendant. In disposing of war surplus the Government is not engaged in normal trade and frequently is ignorant of the condition of the goods it sells. Buyers have no right to expect, have notice not to expect, and contract not to expect any warranties whatsoever. Plaintiff had such notice from his prior dealings and so expressly contracted in this transaction. The suggestion that representations made in relation to the cancelled purchase somehow became a relevant part of the Chicago contract has no basis in fact and none in law. Parenthetically it might be noted that insofar as moral issues seem to be presented, there is an astonishing discrepancy between plaintiff's first bid of 78¢ a pound and its later, accepted bid of 45¢ a pound for what is asserts it thought were identical goods.

Plaintiff's complaint must be dismissed.

The Troy Contract.

In May, 1945, defendant, through its agent, a Chemical Warfare Service officer, told plaintiff that elastic head harnesses without pyroxylin centers were available for weekly delivery and after being shown what purported to be a sample, in good condition, plaintiff offered 40¢ a pound. A contract dated May 7, 1945 was entered into which provided, inter alia, "5. Inspection. Bidders are invited and urged to inspect the property to be sold prior to submitting bids. * * * In no case will failure to inspect be considered ground for a claim.

"6. Sale of Property 'As Is'. Unless otherwise specified, all property is sold 'as is'; the Government makes no guaranty, warranty, or representation, express or implied, as to the kind, size, weight, quality, character, description, or condition of any of the property, or its fitness for any use or purpose; this is not a sale by sample." The "Schedule of Property to be Sold", attached to the contract and forming part thereof, described the property simply as "Head Harnesses".

The contract was to be in effect 90 days, during which the defendant was to ship from time to time, and plaintiff to receive and pay for, such accumulations of the head harnesses as should become available from a specified manufacturing plant "so that", as the contract stated, "valuable storage space will not become occupied with salvage material".

Plaintiff paid $1,500 in advance, received two shipments delivered on May 14, and May 18, 1945, and paid for them on May 17 and May 21, 1945, respectively. After the second shipment, plaintiff inspected the goods, found them dirty, not up to sample, having pyroxylin coated center-pieces, and composed in part of sweepings, metal and rubber bits, and very short pieces, and complained thereof to defendant's agent, demanding its money back and offering to return the goods. The latter assured it that the next lot would correspond to the sample, and said he would send a representative to inspect the goods, which he requested plaintiff to put aside for that purpose. On June 1, 1945, another shipment arrived, and plaintiff again inspected and complained. On June 18, 1945 a fourth shipment arrived. Shortly thereafter defendant inspected the goods, and offered plaintiff a credit for a portion thereof, conditioned on plaintiff's segregating the useful from the useless goods. On July 24, 1945 plaintiff paid the balance owing for the last two shipments. On July 31, 1945 defendant made a final shipment for which plaintiff refused to pay, and the price of which is the amount demanded in the defendant's counterclaim. Plaintiff counterclaimed for the return of all monies paid.

■ The disclaimer provisions of the "Troy" contract present an even stronger case for the defendant than did the "Chicago" contract. Plaintiff has not invoked section 44 of the Uniform Sales Act, N.Y. Personal Property Law, § 125, paragraph 3 of which permits a buyer to reject all goods delivered if some of them are goods of a description not included in the contract. It might have argued that the goods contracted for were "head harnesses", and that since a portion of the goods delivered was not "head harnesses", but rather metal bits and short strips, the buyer might properly reject the whole.

But plaintiff failed to exercise this power of rejection. Except for the last shipment, plaintiff rejected neither all nor a part of the goods delivered but paid for each soon after receipt, asking merely that a credit be given it for that portion of which it complained.[1] It has failed to segregate, and hence has not established what proportion of those goods consisted of metal bits and short strips. Consequently it has not provided any measure for such a credit, even assuming that as a matter of law the contractual disclaimers did not bar such a claim.

■ The plaintiff did refuse, however, to pay for the final shipment, and the evidence is sufficient to establish that "* * * a lot of metal goods, ear pieces, mouth pieces, rubber tubes * * *" were present, and that the plaintiff made timely discovery thereof and made a timely rejection. It cannot be said that he waived his right to reject. Nor does the contractual understanding that "* * * the Government makes no guaranty, warranty, or representation, express or implied, as to the kind * * *" of goods involved bar the right to reject goods of a nature different from those contracted for. Were a purchaser to buy a race horse under a contract containing such a disclaimer, and the seller to deliver a clotheshorse, no one would maintain that the buyer could not reject.

The plaintiff's and defendant's counterclaims are dismissed.

Judgment will be entered for the defendant dismissing the complaint and plaintiff's counterclaim and for the plaintiff dismissing defendant's counterclaim.

Submit findings on five days notice.

---

[1]. On redirect, plaintiff's president testified as follows: "By Mr. Curtis: Q. * * * Isn't it a fact that you refused to pay that amount because you had had oral conversations with Lieutenant Shapiro in which you agreed to pay for the goods you had received by July 24 subject to credits to be allowed by his inspecting officers and that no credits had been made?" * * * "A. Yes, sir."