**DADOURIAN EXPORT CORPORATION,**
Plaintiff-Appellant,

v.

**UNITED STATES of America,**
Defendant-Appellee.

No. 313, Docket 26699.

United States Court of Appeals
Second Circuit.

Argued April 11, 1961,

Decided June 5, 1961.

Richard K. Gregory, New York City, for plaintiff-appellant.

Renee J. Roberts, Asst. U. S. Atty., New York City (Morton S. Robson, U. S. Atty., for the Southern District of New York, New York City, on the brief), for defendant-appellee.

Before CLARK, MEDINA and FRIENDLY, Circuit Judges.

MEDINA, Circuit Judge.

On December 14, 1956, the United States through the New Cumberland General Depot of the United States Army, at New Cumberland, Pennsylvania, circulated, together with forms for bidding and General Sale Terms and

Conditions, an invitation for bids upon 91 items of government surplus property. Among the items listed for sale were items 65 through 73, which were described in the bid forms in the following manner:

| "Item No. | Description and Location of Property | Quantity | Unit of Measure |
|-----------|-------------------------------------|----------|-----------------|
| 65 to 73 | Nets, Cargo, 20′ x 40′, Manila rope meshes 8″ square frame 3¾ circ mesh rope, 3″ circ with lanyards Paulsen Weber or equal loose | (505) | each" |

On the invitation there appeared in large capital letters the statement "It has been determined that this property is no longer needed by the federal government." Moreover, on both the invitation and on each bid form were the words "Caution: inspect the property," in italicized capitals. The invitation urged bidders to read the accompanying General Sale Terms and Conditions. These provided in pertinent part as follows:

"1. Inspection.—Bidders are invited and urged to inspect the property to be sold prior to submitting bids. Property will be available for inspection at the places and times specified in the invitation. The Government will not be obliged to furnish any labor for such purpose. In no case will failure to inspect constitute grounds for a claim or for the withdrawal of a bid after opening.

"2. Condition of Property.—All property listed herein is offered for sale 'as is' and 'where is,' and without recourse against the Government. If it is provided herein that the Government shall load, then 'where is' means f. o. b. conveyance at the point specified in the invitation. The description is based on the best available information, but the Government makes no guaranty, warranty, or representation, expressed or implied, as to quantity, kind, character, quality, weight, size, or description of any of the property, or its fitness for any use or purpose, and no claim will be considered for allowance or adjustment or for rescission of the sale based upon failure of the property to correspond with the standard expected; this is not a sale by sample."

Early in January, 1957 plaintiff, a corporation which had dealings in "military surplus goods," according to its letterhead, submitted bids on several items, including items 65 through 73. Bids were opened on January 8, 1957, and on January 16 plaintiff's bid of $30,893 on items 65 through 73, accompanied by a $7,000 deposit, was accepted. At no time before it submitted its bid did plaintiff inspect the nets, although the nets were available for inspection, having been segregated and laid out on wooden pallets. However, on January 3, 1957, one Sam Chapootian, an employee of an affiliate of plaintiff, placed a long distance telephone call to James E. Dinger, the Property Disposal Officer at the New Cumberland Depot. Dinger not being available, Chapootian spoke to Jack P. Patton, Assistant Property Disposal Officer. According to Chapootian, Patton told him that the documents in his office indicated that the nets in items 65 through 73 were made of Manila rope. Patton read to Chapootian the description from the turn-in slips which had been sent to the depot from the agency which had forwarded the nets to it. The turn-in slips described the nets as save-all nets made of Manila rope. Patton did not, however, inform Chapootian, nor

does it appear that he was personally aware of the fact that the tags physically attached to the nets did not state that the nets were made of Manila rope. Those tags read only "Net Cargo, 20' x 40'." According to Patton, he concluded his conversation with Chapootian by advising him to inspect the nets, but Chapootian denied this.

After its bid was accepted plaintiff sold the nets to a third party. When this third party went down to New Cumberland to take delivery, he discovered that at least some of the nets tendered were not made of Manila rope. However, it does not appear how many nets were made of Manila and how many were not. Moreover, the nets were not cargo nets but saveall nets. According to the Armed Services Board of Contract Appeals which rendered a decision relating to the dispute now before us, a cargo net is a net used to move cargo, while a save-all net is a net which is strung between ship and pier to prevent cargo which is being loaded or unloaded from dropping into the water.

Plaintiff refused to pay the balance of $23,893 due on the contract, stated that it would take delivery only of those nets made of Manila rope and requested an adjustment of the total contract price on that basis, making no issue of the fact that the nets were saveall nets rather than cargo nets. This was natural enough as plaintiff's counsel commented before the Armed Services Board of Contract Appeals that the nets had been resold as waste to a paper manufacturing company, although in the affidavit submitted in support of plaintiff's motion for summary judgment it is asserted they were resold to someone in the rope business. The upshot was that the request for a price adjustment was denied by the Contracting Officer, and on February 21, 1957 plaintiff was notified that the government would reclaim the nets, resell them and apply the proceeds of the resale to costs incurred for plaintiff's account, if the nets were not removed and paid for by March 6, 1957. Since plaintiff could get no relief from the Contract-

ing Officer, it appealed to the Armed Services Board of Contract Appeals, pursuant to the terms of the Disputes Clause, Article 15 of the General Sale Terms and Conditions of the contract, and the Board held it had no jurisdiction to grant rescission, but, over strong dissent, decided on the merits that plaintiff was not entitled to a price adjustment under Article 8 of the General Sale Terms and Conditions of the contract, dealing with adjustments for variations in quantity. Slightly more than a month after the filing of the decision by the Board, but almost a year after the nets were reclaimed by the government, the nets were resold to the highest bidders for $7,830.87. On the resale the nets were not described as made of Manila rope.

Having lost its appeal to the Armed Services Board of Contract Appeals, this action was brought by plaintiff under the Tucker Act, 28 U.S.C. § 1346(a)(2), for rescission and the return of its deposit, the government counterclaimed for damages for breach of contract in the amount of $17,152.81 with interest, and, on cross-motions for summary judgment the complaint was dismissed and judgment rendered in favor of the government for the full amount of its claim, including the expenses of the resale. Plaintiff appeals.

■ Except for the dispute over what was said over the telephone by Chapootian and Patton, which is of no consequence as this action under the Tucker Act is not and could not be based on a claim of fraud, United States v. Silverton, 1 Cir., 1952, 200 F.2d 824, 826, the facts are not in controversy. Plaintiff did not inspect the property, the nets were saveall nets and not cargo nets, a substantial but unascertained number of the nets were not made of Manila rope, and it is conceded that "Manila rope is worth a vast deal more than fiber rope." Under these circumstances we need not concern ourselves further with the decision of the Armed Services Board of Contract Appeals as the Disputes Clause does no more than make findings of fact

by the Board conclusive on the parties in the event of later court proceedings. The facts relied upon here by plaintiff are the same facts found by the Board in its opinion.

Thus appellant argues:

(1) that the description of the nets in the Invitation to Bid was not "based on the best available information" within the meaning of that clause as used in Article 2 of the General Sale Terms and Conditions;

(2) that there was a mutual mistake of fact going to the existence or identity of the subject matter of the contract as distinct from a mere mistake of "description";

(3) that it is entitled to a price adjustment under Article 8 of the General Sale Terms and Conditions of the contract;

(4) that the counterclaim should be dismissed because it is claimed the delay of the government in the resale of the nets was unreasonable as matter of law;

(5) that there were issues of fact on the subject of the damages to be awarded on the counterclaim, because the nets were not offered for resale as Manila nets and because the government could have mitigated such damages by segregating the Manila nets from the fiber nets and selling them separately.

We find no merit in the contentions relative to plaintiff's claim for the return of the deposit or for a price adjustment, but we have decided to remand the case for a trial on the question of the amount of damages to be awarded on the counterclaim.

■■ By way of preliminary it is to be noted that this is no ordinary contract between buyer and seller for the purchase and sale of a valuable commodity. When the government sells surplus goods it is trying to dispose of a vast miscellany of used and unused property in an effort, so far as may under the circumstances be possible, to minimize its loss. Sales of this character are processed on a mass quantity basis by members of the armed forces who seldom if ever have any expertise in the particular items which come to their warehouses and depots. Buyers of such surplus property know perfectly well that there is always the chance of buying property that may turn out to be of little value, or may develop into a great bargain with a huge windfall of profit. Accordingly, the government very properly has protected itself by formulating its contract for the sale of such surplus property so as to shift the risk from itself to the buyer. As Professor Corbin tells us, a party to a contract may agree to assume certain risks that in the absence of agreement the law would not cast upon him. See 3 Corbin, Contracts (1960), Section 598. See also United States v. Hathaway, 9 Cir., 1957, 242 F.2d 897. Moreover, the bidder is given a very real measure of protection by the Disputes Clause, Article 15 of the General Sale Terms and Conditions, which provides that questions of fact in controversy between the bidder and the government shall be decided by the Contracting Officer, with a right of appeal to the Armed Services Board of Contract Appeals. That such an appeal is no formality is apply demonstrated by the record in this case which contains a full and reasoned opinion by Colonel William M. Meyers, JAGC member of the Board, in which nine other members of the Board concurred; three concurred in the result, and six dissented.

■ Appellant first contends that the description of the nets was not based on the best available information, in contravention of Article 2 of the General Sale Terms and Conditions, which in part provides:

"* * * The description is based on the best available information, but the Government makes no guaranty, warranty, or representation, express or implied, as to quantity, kind, character, quality, weight, size, or description of any of the property * * *."

It is argued that this is a condition, the performance of which is precedent to any

obligation of the buyer under the contract. We do not view this clause as either a condition or a warranty; rather we view it in connection with the disclaimers following it as a warning to bidders that the description may not be accurate. It calls attention to the possible incompleteness or inaccuracy of the information upon which the description is based. The government is merely saying that we try to do our best. It does not warrant that the description shall be in fact based on the best available information. As Article 1 of the General Sale Terms and Conditions and the statements upon both the invitation and the bid forms make abundantly clear, a prospective bidder may eliminate the risk that the description may not be based upon the best available information by inspecting the property and thus actually determine for himself whether the description is in fact accurate.

■ The main ground on which appellant asserts its right to rescind and to have its deposit returned is that there was a mutual mistake of fact going to the existence or the identity of the subject matter of the contract. The argument runs that both appellant and the government intended to buy and sell cargo nets made of Manila rope and what was tendered were saveall nets at least some of which were not made of Manila rope. Insofar as the nets were saveall nets rather than cargo nets we are not impressed, because we do not believe that this went to the essence of the bargain between appellant and the government. While appellant here and in the District Court has made much of the fact that the nets were saveall nets rather than cargo nets, it objected to delivery only because some of the nets were not Manila, and this objection in turn was based on the alleged fact that the nets had been resold and represented as Manila nets. Nor do we think the fact that not all of the nets were Manila goes to the identity or the existence of the subject matter of the contract. We believe the subject matter of the contract was nets or nets used in shipping. The word

Manila was merely descriptive. Appellant had no right to rely on such descriptive language, because Article 2 of the General Sale Terms and Conditions expressly disclaimed any "guaranty, warranty, or representation, express or implied, as to quantity, kind, character, quality, weight, size or description." What the case comes down to is that appellant disregarded repeated warnings in the Invitation and bid forms to inspect the property and has only itself to blame for the predicament in which it finds itself.

Appellant's theory of lack of identity apparently stems from a comment by the court below in United States v. Silverton, supra, 1 Cir., 1952, 200 F.2d 824, to the effect that even if the bidder failed to inspect the goods he could prevail against the government if the government had offered to sell apples and delivered oranges. And in his opinion in that case Chief Judge Magruder did say that if the government in that case had offered to deliver "scrap webbing mixed" as a subhead under "Textile, Cotton," and instead delivered a shipment consisting "wholly of scrap metal," "it might be that the bidder, even though he had failed to make an inspection before submitting his bid, could have rejected the shipment as not conforming to the contract." 200 F.2d at page 828. The whole rationale of Silverton, however, is opposed to any recovery by appellant here. The invitation to bid, under the heading "Textile, Cotton," included 40,-000 pounds of "Webbing, scrap, mixed." Silverton's bid of $2.51 per pound was accepted. When the shipment arrived it contained a miscellaneous assortment of army equipment, such as canteen covers, leggings, cartridge belts, gas masks and haversacks, mostly with pieces of metal attached. Silverton's claim was that "Webbing, scrap, mixed" had a definite meaning in the trade to the effect that the webbing is free of metal components, that he had purchased the material for resale for the purpose of conversion into fiber for paper-making and that the presence of the metal parts

made the material useless for paper-making. The lower court agreed with this, cited by way of analogy a sale of apples and delivery of oranges, and ruled in favor of the bidder. On appeal the First Circuit reversed, held any trade meaning of the descriptive phrase "Webbing, scrap, mixed" and the presence of the metal to be immaterial. The reasoning of the First Circuit, with which we agree, appears at 200 F.2d page 827, as follows:

"The invitation to bid was evidently framed to spare the government the necessity of attending to the niceties of detail in describing the goods offered, for example, to make the description conform to any possible trade usages of which the salvage officers might not even be aware. Under the terms of the sale, with inspection invited prior to the submission of bids, *caveat emptor* was certainly intended to be applied to the furthest limit that contract stipulations could accomplish it."

While appellant relies heavily upon our decision in American Elastics, Inc. v. United States, 2 Cir., 1951, 187 F.2d 109, 113, it is to be noted that the sale there was of "gas mask elastic pieces" scrap, as it accumulated at the plant of Cluett, Peabody & Company in Troy, New York, during the ninety-day life of the contract at 40 cents per pound. Apparently, under these circumstances, there could have been and was no opportunity, prior to the making of the contract, to inspect all the property. What happened was that the shipment when made contained a certain amount of the scrap intended to be sold and also a "substantial quantity of foreign matter," described as "resembling sweepings, which was of no value." We held the contract was governed by Section 125(3) of the New York Personal Property Law, McKinney's Consol. Laws, c. 41, which gave the buyer the option, under such circumstances, of rejecting the goods *in toto*.

Having concluded that plaintiff is not entitled to rescission and the return of its deposit we now approach the question whether it is entitled to a price adjustment under Article 8 of the General Sale Terms and Conditions which provides for an adjustment for "[a]ny variation between the quantity * * * listed for any item and the quantity * * of such item tendered or delivered to the Purchaser * * *." The Armed Services Board of Contract Appeals decided this question against plaintiff on the merits. We agree with the Board. The variation here is not a variation in quantity, rather it is one of description. We do not agree that the Board's decisions in Tulsa Army and Navy Store, 1960, A.S.B.C.A. No. 6449, 60–2 B.C.A. (CCH) Para. 2785, and The State Metal and Steel Co., 1957, A.S.B.C.A. No. 3494, 57–1 B.C.A. (CCH) Para. 1276, are inconsistent with its decision in this case, as claimed by appellant. Those decisions merely allowed adjustments under the variation in quantity provision in situations where some or all of the items tendered differed in identity from the items listed. They did not deal with a mere variation in description such as we have in the case before us.

We conclude that the trial judge correctly denied plaintiff's motion for summary judgment and correctly held that plaintiff was not entitled to the affirmative relief demanded. However, we hold it was error to grant the government's motion for summary judgment on its counterclaim.

While there is no merit in appellant's contention that the government should have represented the nets on the resale as made of Manila rope, as at that time the government was fully aware of the fact that some of the nets were not made of Manila rope, it is clear to us that there is a genuine issue of fact on the question of damages and there must be a trial of this issue. While it is impossible to ascertain from the record before us how many of the nets were

made of Manila rope and how many were not, there is no doubt that those made of Manila rope were of much higher value than those that were not. No satisfactory explanation is made of the fact that all were sold together, without segregating those made of different fibers into two separate lots, if such be the fact. It would seem to have been a simple matter to describe the nets made of Manila rope as made of that fiber and to sell them separately. If on resale, the government did not describe those nets made of Manila as such, there would be a question of fact as to whether it had exercised reasonable care and judgment in making the resale, for if it did resell it was bound to exercise such care and judgment. Uniform Sales Act, Section 60(5); N. Y. Personal Property Law, Section 141(5); A. B. Small Co. v. American Sugar Refining Co., 1925, 267 U.S. 233, 45 S.Ct. 295, 69 L.Ed. 589; A. B. Small Co. v. Lamborn & Co., 1925, 267 U.S. 248, 45 S.Ct. 300, 69 L.Ed. 597; Sheehan v. Braddock Coal Co., 1 Cir., 1923, 293 F. 573; 3 Williston, Sales, Section 547. See also Uniform Commercial Code (1958 ed.), Section 2–706. If the government did not describe those nets made of Manila as such, the trier of fact might conclude that the resale was unreasonable. We need not now decide whether the delay of over a year before the resale was unreasonable, as that question may be considered on the remand together with other disputed matters bearing on the subject of the damages recoverable on the counterclaim.

The judgment appealed from is affirmed, except that the case is remanded for a trial of the issue of damages arising out of the government's counterclaim.

FRIENDLY, Circuit Judge (dissenting).

In my view plaintiff's motion for summary judgment should have been granted and the Government's denied.

Understanding of this case seems to me to demand fuller statement of the Government's invitation and of plaintiff's bid than the majority's. Not one but three groups of cargo nets, Items 53 to 58, 59 to 64, and 65 to 73, were offered. They were respectively described as follows:

"Nets, Cargo, 12′ x 12′, Meshes 8″ Square, frame of 3¾ circ fiber rope netting of 3″ circ fiber rope with lanyards loose (Unused)

"Nets, Cargo, 18′ long x 5′ wide Meshes 8″ sq frame of 3¾ circ fiber rope netting of 3″ circ fiber rope with lanyards loose (Unused)

"Nets, Cargo, 20′ x 40′, Manila rope meshes 8″ square frame 3¾ circ mesh rope, 3″ circ with lanyards Paulsen Weber or equal loose." [1]

Plaintiff's bids for Items 65–73 were a higher percentage of the Government's stated acquisition cost than in the case of the other groups; it was the successful bidder only for the former.

It is plain beyond peradventure that, had this been an ordinary sale, plaintiff would have been entitled not merely to rescind but to recover damages when it discovered that a portion of the nets were not "Manila rope," which the Government's trial attorney before the Board of Contract Appeals conceded to be worth "a vast deal more than fiber rope." 1 Williston, Sales (1948 ed.), p. 577: Uniform Sales Act, § 14; Uniform Commercial Code, § 2–313. Here plaintiff properly makes no claim for damages; it insists only that it not be held to a bargain it never made.

If plaintiff is to be so held, this must be because of paragraphs 1 or 2 of the General Sale Terms and Conditions. Paragraph 1, entitled "Inspection," is not adequate to that office. It says only that "failure to inspect" will not "constitute grounds for a claim or for the withdraw-

---

1. Although the word "(Unused)" did not appear after the description in Item 65, it did in Items 66–73.

al of a bid after opening." Although this ineptly worded clause may have the effect of excluding any liability under an implied warranty of quality, it surely does not go so far as to say that because the prospective buyer does not inspect before bidding, the seller may require him to accept goods not conforming to the description, see Uniform Commercial Code, § 2–316(3) (b) and comment 8.

The argument that paragraph 2 supports the Government's position is that, in a sale of specified goods, the buyer's right to reject for failure of the goods to conform to the description rests on the seller's breach of warranty that the goods will so conform;[2] hence, since paragraph 2 negates any warranty "as to quantity, kind, character, quality, weight, size or description of any of the property, or its fitness for any use or purpose," the buyer has no right to reject or rescind.

The first answer to this is that courts properly decline to give so literal an effect to a disclaimer of a warranty of description, as is clearly shown by Chief Judge Magruder's opinion in United States v. Silverton, 1 Cir., 1952, 200 F.2d 824, 826 and this Court's in American Elastics, Inc. v. United States, 2 Cir., 1951, 187 F.2d 109, 113.[3] My brother Medina's opinion makes it plain that he would not follow the logic of the Government's argument so as to hold the plaintiff if Items 65–73 had turned out to be canvas sheets rather than cargo nets; I doubt he would if the nets had proved to be made of cotton. Hence the question becomes one of degree. In my brother Medina's view "Manila rope" did not go to the essence; to my mind, the sharp differentiation among the three descrip-

tions and the Government's concession that Manila rope was worth "a vast deal more" than fiber rope, make the case analogous to Chief Judge Magruder's example in United States v. Silverton, not, indeed, of apples and oranges, but of "Webbing, scrap, mixed" which turned out to be entirely scrap.

A second answer is that the construction of paragraph 2 urged by the Government fails to take account of the provision that "no claim will be considered for allowance or adjustment or for rescission of the sale based upon failure of the property to correspond with the standard expected; this is not a sale by sample." If the preceding clause truly had the effect of so completely negating the warranty that the goods were of the sort advertised as to deprive the buyer of his normal right to reject or rescind, there was no need for the latter provision. We are bound to endeavor to give effect to all words even of a Government contract, and also to construe language to give a sensible result. It is because of this latter requirement that the courts refuse to construe this broad disclaimer of a warranty of "kind, character * * * or description" so as to permit the delivery of apples in place of oranges, although that is what the words say. Yet there is a way in which those words can be given literal effect and the courts spared the almost impossible task of having to determine what part of the description is essential and what is not. That is by reading the first portion of the sentence as dealing with claims for damages against the Government and the second portion as regulating claims "for allowance or adjustment or for rescission * * *." On that reading the sen-

---

2. This warranty is stated to be "implied" in the Uniform Sales Act, § 14, but "express" in the Uniform Commercial Code, § 2–313, the law of Pennsylvania where this sale occurred, Act of April 6, 1953, P.L. 3; 12A Purdon's Penna.Stats.Ann. § 1–101 et seq.

3. I am unable to accept the majority's distinction of the American Elastics case based on lack of opportunity by the buyer to inspect before the contract was made. The contract had an inspection clause substantially identical with that here, and the record shows that the buyer's president admitted "It is possible" that he was "requested to visit the contractor's plant and inspect the material personally." Moreover, neither this Court nor Judge Rifkind in the District Court, S.D.N.Y. 1949, 84 F.Supp. 194, 197, went on that ground.

tence is no bar; plaintiff is not seeking damages and its claim for rescission is based, not "upon failure of the property to correspond with the standard expected," but upon failure to be the kind of property that was promised.

Finally—and I pose this as a question rather than a conclusion—does not a buyer's right to reject goods not conforming to the description rest on a concept even more basic than breach of warranty? Clearly that is so when the goods are unspecified at the time of the sale. Pope v. Allis, 1885, 115 U.S. 363, 371–372, 6 S.Ct. 69, 29 L.Ed. 393; United States v. Koplin, D.C.N.D.Ga.1928, 24 F.2d 840, 841, Sibley, J. But even when the goods are specified, is there not a failure of the minds to meet, bringing into play a principle akin to that of Raffles v. Wichelhaus, [1864] 2 H. & C. 906, see 1 Williston, Contracts (3d ed.) § 95,[4] or the rule whereby courts of the British Commonwealth allow rescission after acceptance in such cases on the ground of a breach of condition despite the general English doctrine that the buyer's only remedy after acceptance is a suit for breach of warranty, Varley v. Whipp, [1900] 1 Q.B. 513; Cotter v. Luckie, [1918] N.Z. LR 811; cf. Kirkpatrick v. Gowan, Ir.Rep. 9 C.L. 521 (1875); 34 Halsbury, Laws of England (1960), pp. 48, 50? The Government intended to sell the advertised lots, whether Manila rope or not; plaintiff intended to buy only if they were Manila. When the error is discovered before the goods are delivered, and the transaction can be rescinded without cost to the Government

other than readvertising the goods as what they really were, what reason is there to hold the buyer, even on a sale of surplus? *Per contra*, what reason would there be to force the Government to deliver surplus goods advertised as glass if these turned out to be rock crystals or industrial diamonds? Of course, parties can use language that gets them into precisely these predicaments, but it ought be very clear they have done so before they are held. See Vigers Brothers v. Sanderson Brothers, [1901] 1 K.B. 608; Karsales (Harrow) Ltd. v. Wallis, [1956] 2 All E.R. 866, C.A. Such a view may lie behind the Uniform Commercial Code's reclassification of the warranty of conformity to description from implied to express, and its negative attitude toward disclaimers of such a warranty, § 2–316, see also comment 1 on § 2–313, and § 2–302. Cf. Andrews Brothers (Bournemouth), Limited v. Singer and Company, Limited, [1934] 1 K.B. 17. I would follow the lead of the Code, whether the transaction here be deemed governed by the law of Pennsylvania or, as it probably is, by "federal law," Clearfield Trust Co. v. United States, 1943, 318 U.S. 363, 366, 63 S.Ct. 573, 87 L.Ed. 838, with the Code taken as a source, N. Y., N. H. & H. RR. Co. v. R. F. C., 2 Cir., 1950, 180 F.2d 241, 244. Moreover, if we are fashioning federal law, I would doubt that the ultimate best interests of the Government, even in surplus disposal, are advanced by a rule permitting such insistence on or, as I view it, beyond the letter of the bond as has been practiced here.

---

4. It may be that Frigaliment Importing Co. v. B. N. S. International Sales Corp., D.C.S.D.N.Y.1961, 190 F.Supp. 116, decided by the writer, might better have been placed on that ground, with the loss still left on the plaintiff because of defendant's not unjustifiable change of position, 5 Williston, Contracts (2d ed.), § 1595; American Law Institute, Restatement of Restitution, § 178.