**UNITED STATES of America,**
**Plaintiff,**

v.

**Stephen L. HOFFMAN, Defendant.**

**Civ. No. 60-C-597.**

United States District Court
E. D. New York.

June 24, 1963.

Joseph P. Hoey, U. S. Atty. for Eastern Dist. of New York, for plaintiff; Martin R. Pollner, Asst. U. S. Atty., of counsel.

Brower, Brill & Gangel, New York City, for defendant; Irvin Husin, New York City, of counsel.

ZAVATT, Chief Judge.

This is an action to recover the sum of $15,296 plus interest allegedly due from the defendant as the unpaid balance on a contract to purchase Government surplus leather jackets, dated July 21, 1954. In addition to a general denial, the defendant pleads three affirmative defenses, two of which are also pleaded as setoffs. The first affirmative defense alleges (1) a breach of warranty by the auctioneers, as agents of the plaintiff, by means of a misleading brochure; (2) misleading oral representations and (3) the prevention of inspection of the jackets by the defendant. The second affirmative defense alleges that the representations made by the auctioneer, as agent of the plaintiff, were falsely and fraudulently made with the intent that the defendant rely on them; that the defendant did so rely and was falsely induced to enter into the contract. The third affirmative defense alleges that the

plaintiff defaulted in its performance by failing to make the jackets available for inspection; by requesting and accepting bids for merchandise other than what was actually offered for sale and that the goods attempted to be delivered were inferior and unusable waste.

The defendant, Stephen L. Hoffman, is a person of wide business and legal experience. He has been a practicing attorney for thirty-two years, dealing mainly in commercial matters. During seven of these years he was employed by the federal Government in the Legal Department of the Office of Price Administration. In addition to his legal practice, he is engaged in the operation of several substantial factoring corporations worth several hundred thousand dollars. Prior to July 21, 1954 he had dealt in leather goods but had not dealt in Government surplus property.

On June 23, 1954, Milton J. Wershow and David Weisz, auctioneers of Los Angeles, California, were the successful bidders for the contract to conduct an auction sale (No. 55–1) of 400 lots of Government surplus property encompassing a variety of items, including Men's Air Crew Jackets. The auction sale was to be held at Wilkins Air Force Depot, Shelby, Ohio, on July 21, 1954 commencing at 8:30 A.M.

Under the general supervision of the Supply Disposal Officer at Wilkins, the auctioneers prepared an auction "catalog". The auctioneers prepared a brochure, which was distributed widely several days before the sale, and inserted advertisements of the sale in several newspapers. One of these newspaper advertisements appeared at page 29 of the New York Herald Tribune of July 9, 1954 and was read by the defendant while he was in New York City several days before the announced date of the sale. It stated that a majority of the items offered for sale were "unused" and listed the Men's Air Crew Jackets under the heading of "UNUSED CLOTHING." At least three days before the sale, and while the defendant was in New York City, he received at least two copies of the bro-

chure which had been prepared by the auctioneers—one by mail from the auctioneers and one from a Mr. Rappaport, an experienced fur auctioneer of New York City. In several places, the brochure stated that a majority of the items being offered for sale were unused. It listed 6700 Aircrew Leather Jackets— Type D–1 Full Fleece Lined under the heading "UNUSED CLOTHING" and the subheading "UNUSED MEN'S CLOTHING." The brochure stated:

" * * * Quantities and descriptions are listed for buyer's guidance and are not to be considered a guarantee or warranty. The auctioneers and/or the Air Force will not be held responsible for advertising inaccuracies. * * * A printed catalog, with Government standard contract form, terms, and conditions of sale and description of each lot will be AVAILABLE ON SITE DURING THE INSPECTION PERIOD and AT THE AUCTION. Sale will be held from catalog in an auditorium."

The brochure stated the dates during which all of the items to be sold were available for inspection at Wilkins, *i. e.*, between 7:00 A.M. and 3:30 P.M. (E. S.T.) on July 16, 17, 19 and 20, 1954, and urged all interested persons to inspect the property. That the property should be inspected appeared in three places in the brochure—two of them in boldface type, one of which is followed by an exclamation point.

The defendant conferred in New York City with Mr. Rappaport who agreed to accompany defendant to Wilkins and attend the sale as defendant's advisor at the defendant's expense. They left New York City by commercial airplane on July 20, 1954 and arrived at Mansfield, Ohio (the nearest town to Wilkins) during the afternoon of that day. They checked in at the same hotel in Mansfield where Milton J. Wershow, one of the auctioneers, was staying. The defendant and his advisor visited Wershow in his room for approximately five minutes that same afternoon during which Wershow said

that the leather jackets would be a bargain at a price under $7 or $8. Defendant's testimony was contradictory as to whether Wershow said that all of these jackets were new or unused, or whether he said that most of them were new, or whether he said that only some of them were new. (It is to be noted that the defendant has instituted an action in the Supreme Court, New York County, against the auctioneers, alleging fraudulent misrepresentation by them in connection with the auction sale. That action has not been tried).

The defendant then stated to Wershow that he would like to inspect the jackets that afternoon. Whereupon, Wershow suggested that the defendant drive out to Wilkins and see Meyer Poster, one of the auctioneers' employees. Defendant and his advisor drove out to Wilkins that afternoon to inspect the jackets. They met Poster who escorted them to the area of Wilkins where the jackets were crated in 185 to 200 wooden boxes set out in orderly rows of piles of such boxes covered with tarpaulin. Each box contained approximately three dozen jackets. The tarpaulin covering some of the boxes was pulled back by workmen in the defendant's presence. Poster climbed up on one pile of the boxes, opened one box from which he removed three or four jackets and showed them to the defendant and his advisor. The defendant and his advisor inspected these jackets. They did not ask to see any other jackets in that box or any jackets in any other box nor did the defendant attempt to remove any jackets himself from any boxes for, as he testified, he did not wish to soil his clothes. He could have inspected other jackets had he desired to do so. The limited inspection the defendant did make took place late in the afternoon, after 3:30 P.M., i. e., after the time when goods were officially available for inspection.

■ The court finds that the defendant did not rely upon any representations made by auctioneer Wershow as to the quality of the jackets, assuming *arguendo* that the statements made by Wershow that day were representations rather than mere puffing by an auctioneer. Rather, the defendant relied upon his own inspection.

Defendant and his advisor attended the auction sale on July 21, 1954. The defendant received a copy of the auction catalog and a bid form. The front cover of the catalog stated in italics:

"SPECIAL NOTE: *While some items are listed as used, this does not necessarily mean that items not so listed are unused. All merchandise is sold 'as is' with no warranties or guarantees as to condition.*"

In smaller print under the heading "PROCEDURES, TERMS AND CONDITIONS," it was stated on the front cover of the catalog:

"All merchandise will be sold as is, where is, with warranty only as to count and title."

A copy of the general sales terms and conditions had been inserted into the catalog in front of page 1. of all catalogs distributed on the morning of the sale. The defendant read these terms of sale while the sale was going on and before he made his bid.

The catalog which defendant received before he entered the auditorium described the jackets in question as follows:

| LOT NO. | QUANTITY | DESCRIPTION |
|---------|----------|-------------|
| 219 | 5,500 | Men's Aircrew Jackets |
| 223 | 1,248 | Men's Air Crew Jackets |

---

Some of the 400 lots listed in the catalog were described as used, others as new. The vast majority of the lots including the jackets were not described as either used or new. Between 250 and 300 bidders were present. Each prospective bid-

der was required to sign and submit a bid form, Standard Government Form 114 [1] and to make a deposit of 20% of the anticipated bid before he entered the auditorium. Because of the large number of prospective bidders and in order that bidders could be identified, each person who signed a bid form and made the 20% deposit was given a numbered bid paddle. The defendant's paddle number was 81. The only bidders recognized were those who made a bid and

1.

STANDARD FORM 114
GENERAL SERVICES ADMINISTRATION
DISPOSAL DIVISION

SALE OF GOVERNMENT PROPERTY
INVITATION, BID

AUCTION SALE

ISSUED BY: WILKINS AIR FORCE DEPOT

DATE OF INVITATION: 16 JULY 1954

ADDRESS: SHELBY, OHIO

PAGE NO, NUMBER OF PAGES

ORAL BIDS ... conditions, set forth herein, will be received at ... Wilkins Air Force Auction Sale area commencing ... 8:30 o'clock a.m., EST 21 July ... 19.. for purchase and removal of Government-owned property listed below and on continuation sheets numbered pages 2 through ...

| PLACE WHERE BIDS WILL BE PUBLICLY OPENED | TIME | DATE OF BID OPENING |
| --- | --- | --- |
|  | 8:30 AM | 21 July 1954 |

| NAME: LENWARD A. SHELTON, Capt, USAF | TITLE: DISPOSAL OFFICER |
| --- | --- |

| ITEM NO. | DESCRIPTION AND LOCATION OF PROPERTY | QUANTITY (Number of Units) | UNIT OF MEASURE | TO BE SUPPLIED BY BIDDER | |
| --- | --- | --- | --- | --- | --- |
|  |  |  |  | PRICE PER UNIT | TOTAL PRICE BID DOLLARS / CENTS |

SEE AUCTIONEER'S CATALOG — ITEMS 1 thru 400 AND SCHEDULE OF PROPERTY TO BE SOLD.
LOCATED AT "DISPOSAL YARD" NO. BLDG T-21 SECTION A, WILKINS AIR FORCE DEPOT, SHELBY, OHIO.
This auction sale contract has been negotiated pursuant to Section 201, 202 and 203, Public Law 152, 81st Congress.
TIME AND PLACE: Auction Sale commences promptly at 8:30 AM on 21 July 1954.
ALL PROSPECTIVE BIDDERS ARE STRONGLY URGED TO INSPECT THE MATERIAL PRIOR TO DATE OF AUCTION SALE.

SPECIAL NOTE: DO NOT MAIL YOUR BID. MAILED BIDS WILL NOT BE ACCEPTED. PERSONAL OR COMPANY CHECKS CANNOT BE ACCEPTED.
(CAUTION: INSPECT THE PROPERTY)

The property described herein may be inspected between the hours of 7:30 AM and 3:30 PM on 16, 17, 19, and 20 July 1954 by contacting the DISPOSAL OFFICER, WILKINS AIR FORCE DEPOT, SHELBY, OHIO.

A bid deposit of 20 percent of the total amount bid, in the form of cash or express money order, or cashier's or certified check, or such other form of security as may be acceptable to the contracting officer, made payable to the Treasurer of the United States, must accompany the bid.
Property must be removed by the successful bidder within 10 calendar days after notice of award unless otherwise specified in the description or in any special condition, time to be computed from the date of mailing or otherwise furnishing said notice.

| BID | DATE OF BID |
| --- | --- |

In compliance with the above invitation, and subject to all the General Sale Terms and Conditions and any special conditions, the undersigned offers and agrees, if this bid be accepted within ... calendar days (60 calendar days if no period be specified by the bidder) after date of the opening, to purchase any or all of the items described herein upon which prices are quoted, at the price set opposite each item.

Bid deposit in the amount of $_____ is enclosed.

BIDDER REPRESENTS: (Check appropriate boxes) (1) That the aggregate number of employees of the bidder and its affiliates □ 500 or more, □ less than 500; (2) That he □ has, □ has not, employed or retained a company or person (other than a full-time, bona fide employee) to solicit, or secure this contract, and agrees to furnish information relating thereto as requested by the contracting officer.

| NAME AND ADDRESS OF BIDDER (firm name, city and State) | SIGNATURE OF PERSON AUTHORIZED TO SIGN THIS BID |
| --- | --- |
|  | TITLE |

| ACCEPTANCE BY THE GOVERNMENT OF THE UNITED STATES OF AMERICA | DATE OF ACCEPTANCE |
| --- | --- |

ACCEPTED AS TO ITEMS NUMBERED

| TITLE OF CONTRACTING OFFICER | SIGNATURE OF CONTRACTING OFFICER |
| --- | --- |

STANDARD FORM 114
AUGUST 1950 EDITION

displayed their bid paddles and the number thereon.

The defendant signed a bid form as agent for Hoffman and King of 855 6th Avenue, New York, N. Y. It was stipulated before trial that the defendant acted in his individual capacity when he signed the bid form and when he bid, and that the partnership of Hoffman and King is not involved in this litigation. The reverse side of the Standard Form 114 contains the general sales terms and conditions of the sale.[2] The bid form signed by the defendant constituted his offer to purchase.

2.

PAGE 2

Reverse of Standard Form 114
August 1950 Edition

On the morning of the sale, and before the defendant made his bid, the defendant told an Air Force officer that he wanted to make a further inspection of the jackets. The sale having already begun and the crates containing the jackets being a quarter of a mile from the auditorium, the Air Force officer replied that an inspection could not be made at that time.

Lot No. 219, consisting of 5500 Men's Air Crew Jackets, and Lot No. 223, consisting of 1,248 Men's Air Crew Jackets, were auctioned off together. The defendant bid $5.50 per jacket for a total bid price of $37,114 and was the successful bidder. His offer was accepted when the auctioneer knocked down the bid to the defendant as the high bidder on combined lots 219 and 223. This acceptance was executed that day on the defendant's bid form by Captain Shelton, the post Disposal Officer. This acceptance created the contract between the plaintiff and the defendant, a copy of which was delivered to the defendant. When the defendant submitted his bid form that morning he had made a deposit of $2500. Shortly after his bid was accepted he made an additional deposit of $5,000 in order to bring his deposit up to the required 20% of his bid. Although due demand therefor was made by the plaintiff, the defendant refused to pay the balance of $29,614. On August 1, 1955 the plaintiff resold the jackets pursuant to clauses 5 and 7 of the General Sale Terms and Conditions and as a result the plaintiff claims that the defendant is indebted to it in the sum of $15,296 as follows:

| Date of Sale | Lot No. | Purchaser | No. of Jackets | Unit Price | Total |
|---|---|---|---|---|---|
| 8/1/55 | 219 | Webster Sales Co. | 4,552* | 2.58 | $11,744.16 |
| 8/1/55 | 223 | Dadourian Export Co. | 2,248 | 2.51 | 2,758.08 |
| | | Total Resale Proceeds | | | $14,502.24 |
| | | Less Resale Expenses | | | 184.24 |
| | | Net Resale Proceeds | | | $14,318.00 |

Balance due to plaintiff

| | | |
|---|---|---|
| Bid Price | | $37,114.00 |
| Less: | | |
| Net Resale Proceeds | $14,318.00 | |
| Deposit | 7,500.00 | |
| | | 21,818.00 |
| Balance Due | | $15,296.00 |

* 948 jackets in Lot No. 219 were destroyed due to deterioration which occurred after the date when defendant was required to remove the crates from Wilkins and while the crates remained outdoors at the base.

---

The defendant returned to Wilkins on July 27, 1954 with a Mr. Sam Tavelman, a client of the defendant, who was in the clothing business and who was to assist the defendant in the resale of the jackets. In the company of Captain Shelton, they visited the area where the crates were stored. Fifteen to twenty crates were opened and one or two jackets were removed from each of these crates and inspected. At the request of the defendant, another inspection was made by the post Judge Advocate General on August 20, 1954. Ten crates were inspected. Some of the jackets were new, some were reconditioned. Some were mildewed but the mildew could be brushed off. All of the jackets

were serviceable. Another inspection was made by the Depot Inspector either late in August or early in September, 1954. At least five crates were opened. Some jackets were new, some were used; some were moldy and dirty. All the jackets in these cases were serviceable. Another inspection was made on September 17, 1954 in the presence of the defendant, a Mr. Morris Weiner, an advisor of the defendant, the Disposal Officer and others. About forty crates were inspected. Some of the crates had been opened previously and left exposed to the elements. Some jackets were moist or moldy or dirty but the mold or dirt could be removed by brushing it off. But when the mold was brushed off the leather beneath was somewhat discolored. All of the jackets were serviceable. Eighty to eighty-five per cent of the jackets in these crates were new or unused. The balance had been cleaned and reconditioned and returned to a serviceable condition. Six of the forty crates opened were found to contain only new jackets.

The defendant's request for a cancellation of his bid and a return of his deposit was denied. He did not sue the plaintiff. Rather, he brought the action against the auctioneers hereinabove referred to.

The defense of fraud here is of flimsy construction. It consists of four elements:

(a) the allegedly misleading newspaper advertisement;

(b) the allegedly misleading auctioneers' brochure;

(c) the allegedly misleading oral representation by the auctioneer;

(d) the alleged prevention of inspection by the auctioneers' employee.

Both the brochure and the newspaper advertisement describe the jackets as unused clothing. Neither are part of the contract entered into; they are merely invitations to bid. The brochure's repeated and emphasized urgings of inspection mitigate the possibility that the defendant relied on the description therein. In fact, the defendant did conduct his own inspection which shows that he did not so rely. Furthermore, the brochure called attention to the fact that the sale would be pursuant to Government standard contract form, terms and conditions of sale.

Nearly all of the statements by Wershow, the auctioneer, may be accurately labeled as mere puffing. However, he did describe the property as new or unused, whereas some 15–20% of the jackets were used. No proof has been offered to show that the auctioneer knew this or that his statement was made in reckless disregard of the truth. Indeed, his informing the defendant that he might make his own inspection, with the aid of the auctioneers' personnel, tends to negate such a finding. Moreover, the defendant did not rely on the auctioneers' representation but proceeded to conduct his own, albeit limited, inspection of the jackets. In considering the question of reliance, the court cannot close its eyes to the fact that the defendant was at that time a practicing attorney specializing in commercial matters with some twenty-two years of experience; that he was also a businessman who had dealt in leather goods; that he was actively engaged in several large-scale factoring operations; that he was accompanied at the sale by an advisor, who was an experienced auctioneer specializing in furs.

In Ellis Bros., Inc. v. United States, 197 F.Supp. 891 (S.D.Cal.1961), the court suggested that, if the plaintiff had been prevented somehow from inspecting the property purchased under a Government surplus contract similar to that in the instant case, it might be able to rescind. This is not such a case. The court has found that the defendant had full and ample opportunity to inspect the property but chose not to do so. Contrary to his contention, workmen were available on June 20, 1954 to remove the tarpaulins over the crates and means were available to open the crates. Poster did open one crate at the defendant's request, but the defendant did

not even inspect more than a few of three dozen or so jackets in that crate because he did not wish to soil his clothes. Indeed, the defendant did not even arrive at Wilkins in time to inspect during the authorized inspection period, although, having read two of the auctioneers' brochures, he knew the days and hours when the property was available for inspection. The Government's refusal to permit inspection after the sale had begun was not such a refusal as would amount to a breach of the Government's obligation to have the property available for inspection at the times and places specified in the invitation. As the invitation indicated, the property was available for inspection between 7:30 A.M. and 3:00 P.M., on July 16, 17, 19, and 20, 1954. In regard to the allegation of fraud there is no claim that any Government employee or Air Force personnel had any connection with it.

■ Before the defendant bid on the jackets he had in his possession and read other information which negates any possibility that he relied on any alleged misrepresentations. The auction catalog did not describe the property as either new or used. On the cover of the catalog, prominently displayed was this caveat:

> "SPECIAL NOTE: *While some items are listed as used, this does not necessarily mean that items not so listed are unused. All merchandise is to be sold 'as is' with no warranties or guarantees as to condition.*"

The terms of sale, also read by the defendant before he bid, must clearly have indicated to one of the defendant's experience that he could not rely on the auctioneers' statements or representations as to the condition of the goods.

> "1. INSPECTION.—Bidders are invited and urged to inspect the property to be sold prior to submitting bids. Property will be available for inspection at the places and times specified in the Invitation. The Government will not be obliged to furnish any labor for such purpose. In no case will failure to inspect constitute grounds for a claim or for the withdrawal of a bid after opening.

> "2. CONDITION OF PROPERTY.—All property listed herein is offered for sale 'as is' and 'where is,' and without recourse against the Government. If it is provided herein that the Government shall load, then 'where is' means f. o. b. conveyance at the point specified in the Invitation. The description is based on the best available information, but the Government makes no guaranty, warranty, or representation, expressed or implied, as to quantity, kind, character, quality, weight, size, or description of any of the property, or its fitness for any use or purpose, and no claim will be considered for allowance or adjustment or for rescission of the sale based upon failure of the property to correspond with the standard expected; this is not a sale by sample. Reverse of Standard Form 114, Page 2, GENERAL SALE TERMS AND CONDITIONS"

In the absence of any proof of fraud, it is well established that under the terms of the contract entered into the defendant may not claim any breach of warranty or mutual mistake.

"By way of preliminary it is to be noted that this is no ordinary contract between buyer and seller for the purchase and sale of a valuable commodity. When the government sells surplus goods it is trying to dispose of a vast miscellany of used and unused property in an effort, so far as may under the circumstances be possible, to minimize its loss. Sales of this character are processed on a mass quantity basis by members of the armed forces who seldom if ever have any expertise in the particular items which come to their warehouses and depots. Buyers of such surplus property know

perfectly well that there is always the chance of buying property that may turn out to be of little value, or may develop into a great bargain with a huge windfall of profit. Accordingly, the government very properly has protected itself by formulating its contract for the sale of such surplus property so as to shift the risk from itself to the buyer. As Professor Corbin tells us, a party to a contract may agree to assume certain risks that in the absence of agreement the law would not cast upon him. See 3 Corbin, Contracts (1960), Section 598. See also United States v. Hathaway, 9 Cir., 1957, 242 F.2d 897. Moreover, the bidder is given a very real measure of protection by the Disputes Clause, Article 15 of the General Sale Terms and Conditions, which provides that questions of fact in controversy between the bidder and the government shall be decided by the Contracting Officer, with a right of appeal to the Armed Services Board of Contract Appeals." Dadourian Export Corp. v. United States, 291 F.2d 178, 182 (2d Cir. 1961)

In the Dadourian case, which incidentally is not connected with the goods purchased by Dadourian on the resale in the instant case, the plaintiff brought suit under the Tucker Act on its purchase of Government surplus contending that the description of saveall nets (some of which were made of Manila rope) as cargo nets (all of Manila rope) was not based on the best available information in contravention of article 2 of the General Sale Terms and Conditions. Article 2 provides in part:

" * * * The description is based on the best available information, but the Government makes no guaranty, warranty, or representation, expressed or implied, as to quantity, kind, character, quality, weight, size, or description of any of the property * * * "

The court stated:

"It is argued that this is a condition, the performance of which is precedent to any obligation of the buyer under the contract. We do not view this clause as either a condition or a warranty; rather we view it in connection with the disclaimers following it as a warning to bidders that the description may not be accurate. It calls attention to the possible incompleteness or inaccuracy of the information upon which the description is based. The government is merely saying that we try to do our best. It does not warrant that the description shall be in fact based on the best available information. As Article 1 of the General Sale Terms and Conditions and the statements upon both the invitation and the bid forms make abundantly clear, a prospective bidder may eliminate the risk that the description may not be based upon the best available information by inspecting the property and thus actually determine for himself whether the description is in fact accurate." Dadourian Export Corp. v. United States, supra, 291 F.2d at 182, 183. Accord, Western Non-Ferrous Metals Corp. v. United States, 192 F. Supp. 774 (N.D.Cal.1961)

In Ellis Bros., Inc. v. United States, supra, the plaintiff was the successful bidder on a lot of seventy-three Government surplus automobile differentials which had been described as unused, but were in fact used. Prior to bidding the plaintiff had examined one of the differentials and found it satisfactory. There had been a full opportunity to examine the balance but plaintiff chose not to do so. In commenting on the legal significance of Articles 1 and 2 of the General Sale Terms and Conditions the court stated:

"The clauses reproduced, to be found in all Government surplus sale contracts, so clearly exclude *all* recourse to *all* claims against the Government by way of rescission or

904

otherwise that they override what in an ordinary contract might be considered a warranty against misdescription. See, Standard Magnesium Corp. v. United States, 10 Cir., 1957, 241 F.2d 677, 679." Ellis Bros., Inc. v. United States, supra, 197 F.Supp. at 892.

Article 2 of the General Sale Terms and Conditions expressly provides that: "This is not a sale by sample." Therefore, the defendant cannot relieve himself of risk by making an inspection of a portion of the property. American Sanitary Rag Co. v. United States, 161 F.Supp. 414, 142 Ct.Cl. 293 (Ct.Cl.1958). In that case the plaintiff purchased a quantity of sun helmets described as "Apparently unused, in good condition." Only a portion of the sun helmets had been inspected by the plaintiff prior to the sale, although it had had the opportunity to inspect the balance. In fact, one-third of the helmets were mildewed and unusable. The court held that the effect of the contract was to place the risk as to the actual condition of the helmets on the purchaser. Since there were no warranties by the Government there could be no breach of contract on the part of the Government. Clearly the misdescription of the property was not a breach of warranty since by the terms of the contract no warranty was given. In M. Berger Co. v. United States, 199 F. Supp. 22 (W.D.Pa.1961), the plaintiff bid successfully on a lot of surplus bandages described as white. The plaintiff had inspected a portion of the bandages and found them to be white. After the purchase a complete examination disclosed that many of the bandages were brown. The court concluded that the plaintiff's only safe course under the contract lay in making an adequate inspection; having failed to do so it could not complain of a breach of a warranty that was never made to it. See also Paxton-Mitchell Co. v. United States, 172 F.Supp. 463, 145 Ct.Cl. 502 (Ct.Cl.1959).

■ The defendant's third affirmative defense, to the effect that the plaintiff offered goods for sale other than those actually delivered, is entirely unsupported by the proof. The jackets bid on were the jackets delivered. Similarly, the defense contention that delivery was offered of unusable waste is also unsupported by the evidence. While it is true that by the date of resale, August 1, 1955, nine hundred forty-eight jackets had become entirely deteriorated, due apparently to outside storage, the inspection conducted by Lt. Col. Jefferies on September 17, 1954, almost two months after the sale disclosed that all the jackets were serviceable. The defendant's theory of lack of identity stems from comment by the district court in United States v. Silverton, 200 F.2d 824 (1st Cir. 1952), to the effect that even if the bidder failed to inspect the goods he could prevail against the Government if the Government had, so to speak, offered to sell oranges, but delivered apples. However, the Second Circuit in Dadourian, supra, refused to allow rescission on the ground of mutual mistake based upon this theory of lack of identity. The court in Dadourian found the subject matter of the contracts to be nets used in shipping rather than cargo nets or cargo nets made of Manila rope; the word "Manila" was only descriptive. In the instant case there is no question that the subject matter of the contract was leather jackets and that leather jackets were in fact offered for delivery. See, M. Berger & Co. v. United States, 199 F.Supp. 22 (W.D.Pa.1961). Indeed, the Dadourian case has been interpreted as disapproving the theory of lack of identity expressed in Silverton, supra. Ellis Bros., Inc. v. United States, supra.

■■ It is clear that what the case comes down to is that the defendant disregarded repeated warnings in the brochure, catalog and bid form to fully inspect the property and has only himself to blame for the predicament in which he finds himself. See, Dadourian Export Corp. v. United States, supra, 291 F.2d at 183. The express language of the contract clearly states that the Government would not bear the responsibility of failure to inspect. Clearly, the risk of

any disparity between the description and the fact is, by the contract, imposed on the purchaser. United States v. Hathaway, 242 F.2d 897, 900 (9th Cir. 1957). The defendant bought on a grab bag basis. The very terms "as is" and "where is" tell the buyer to investigate. The plaintiff was aware that risks existed. He ventured and lost. His bargain was bad. However, the law provides no remedy for bad bargains willingly risked with wide-open eyes. United States v. Hathaway, supra, 242 F.2d at 900. This particular form of contract, commonly used in Government surplus sales, has often been said to apply the rule of caveat emptor to its fullest possible limits. E. g., Standard Magnesium Corp. v. United States, 241 F.2d 677 (10th Cir. 1957); United States v. Silverton, supra; American Elastics, Inc. v. United States, 187 F.2d 109 (2d Cir. 1951).

In his brief the defendant contends that he is entitled to a credit for the value of the nine hundred forty-eight jackets apparently rendered worthless due to outside storage for which a credit was given to the Webster Sales Corp., on the resale. No mention of this claim was made in the pleadings, but the issue was raised by the court at the trial. It has not, however, been proven that this deterioration was due to outside storage. Many of the jackets were unused or used, might well have been of considerable age and, conceivably, could have deteriorated in any storage. The Government contends that the matter is governed by Article 10(3) of the General Sale Terms and Conditions which provides that "After the date specified for removal of the property, all risk of loss, damage, or destruction from any cause whatsoever shall be borne by the Purchaser." The face of the bid form provides that "Property must be removed by the successful bidder within *10* (typewritten) calendar days after notice of award, unless otherwise specified in the description or in any special condition. * * *" These two provisions read together support the conclusion that risk

of loss of this type is to be borne by the original defaulting purchaser.

The foregoing constitutes the court's findings of fact and conclusions of law. Settle an order consistent herewith on or before ten days from the date hereof granting judgment to the plaintiff for the amount claimed in the complaint.